Matthews vs. Coalter.

MATTHEWS vs. COALTER.

1. What is said by those holding an instrument of writing, at the time of soliciting, or permitting persons to sign the instrument, is evidence of its contents.

2. When a trial has commenced, and witnesses have been examined, it is a matter of discretion with the court, to refuse or permit a party to give a new bond for costs, with a view to cancel the old bond, and to use a security thereto as a witness.

3. The law presumes an erasure, or interlineation to have been made before signing an instrument, unless the instrument be suspicious upon its face. If it will be so considered by the court, no presumption is raised, but the question is to be submitted to a jury.

APPEAL from Randolph Circuit Court.

TODD, for Appellant.

The appellant insists upon the reversal of the judgment below, upon the following points:

1st. The *onus probandi*, lies upon the defendant pleading an erasure in his agreement sued upon after signature, to prove it, for the presumption of law is, that such erasure was made before signing, and being an *alteration* only, made by a stranger, does not avoid it.

2d. That the declaration of persons in possession of the writing sued on, made out of the presence of the party to be charged, is no part of the *res gestæ*, is hearsay, and illegal evidence.

3d. That all testimony given by witnesses hearing others read a writing, without inspection themselves, is not competent evidence to prove what the instrument contained, and what erasure was in it.

4th. That the positive evidence of the witness Estis, who wrote the instrument, that he made the erasure before signing, and at the time of writing, with the other circumstantial evidence, and that witness not impeached in credit, is such conclusive evidence in favor of the validity of the writing, as to show the verdict is clearly against the weight of evidence, and that they were influenced by prejudice, and led away by the illegal instructions of the court.

5th. That a party has a right to release a security for costs, by giving other competent security in his place, so as to obtain his testimony; the execution of such a bond need not be proved, unless required by the opposite party.

6th. The deposition of a witness *de bene esse*, cannot be read by a party, unless he proves the inability of the witness to attend, or his residence beyond sixty miles of the place of trial; for this reason Halley's deposition should have been rejected.

CLARK, for Appellee.

The counsel for the appellee makes the following points, and relies upon the following authorities to sustain the opinion of the circuit court:

1st. It is clear that the article of agreement set out in the bill of exceptions, is the basis of the plaintiff's right of action, and that the obligation of the defendant to pay the plaintiff anything, was created by that agreement, and nothing else.

2d. That the contract of the parties being in writing, we must look to that alone for their will, and the extent of their respective obligations; and if the instrument of writing containing the contract was altered in any material particular, subsequent to its execution, by erasure, or otherwise, without the consent of the defendant, such alteration rendered the same void as against the party not consenting to such change; this is decided in the case of Briggs and Briggs vs. Glenn & Bryant, 7 Mo. R. 572.

3d. The circuit court must be its own judge of the proof of the execution of all instruments offered in evidence, and in this case the amount and kind of evidence given of the execution of the bond offered, does not appear; it was therefore insufficient, as we are bound to presume this principle has been often decided by this court.

4th. If the law was correctly ruled by the circuit court on the trial, it is very clear the motion for a new trial was properly refused, there being evidence from which a jury might well find for either of the parties.

NAPTON, J., delivered the opinion of the court.

This was a suit before a justice of the peace of Randolph county, brought by Henry Matthews against Sterling Coalter, upon the following agreement: "We the undersigned do agree to pay the sum of one dollar for all wolves that is killed by any of said assignors if the wolf is started in fifteen miles of Green Moore's for twelve months from this date. All persons must assign this subscription within four months. January 29, 1841;" which was signed by said Coalter, and said Matthews, and several others. Immediately after the word "miles," appeared written the word "square," with a black line drawn over it. Matthews obtained a judgment in the justice's court, for eight dollars and costs. Upon an appeal to the circuit court, a trial de novo was had, the result of which was a verdict and judgment for the defendant Coalter.

At the trial, the plaintiff who had been previously ruled to give security for costs, desired to use Green Moore, one of the obligors on his bond, as a witness, and for that purpose tendered another bond in lieu of the one then on file; but the court refused to permit this to be done, on the ground that the bond tendered was not sufficiently proved. To this, exceptions were taken.

It was proved, or admitted on the trial, that the plaintiff had killed eight wolves, at a place about thirteen miles from Green Moore's house.

It seems that some time in the month of February, 1841, there was what is termed by the witnesses an *infair* at the house of one Rowland; that several persons on their way to this entertainment, called at the house of Coalter, the father of defendant; that this article for the extermination of wolves became the topic of conversation, and one Estis, who it seems had written the agreement, read it to the company for the purpose of procuring subscribers. Defendant on that occasion requested Estis to put his name down as a subscriber, and it was accordingly done. Afterwards this *wolf article* was much discussed at Rowland's, and there also several additional subscribers were procured.

Several witnesses swear, that when the article was read at Rowland's, it had the word "square" in it.

Haliburton, a witness for defendant, testified, that sometime in the winter, or spring of 1841, at Centreville, he saw a paper in the possession of Green Moore, said to be a wolf article, to which said Moore was soliciting subscribers; he did not read the article, but heard it read, that it became a question whether the article would include one Lowry who proposed signing it, but that it seemed to be admitted, that it would not, and thereupon he saw some person, he knew not whom, with a pen in hand, and saw the pen above or about the paper, but did not see it touch the paper, and did not know that any word was erased from the paper, but heard some one say afterwards that "the article now would include Lowry." He also heard the article read, and it read differently from what it did before. To this evidence exceptions were taken.

The defendant's sister swore that she was present at her fathers, when defendant authorized his name to be put to the article; that she heard Estis read it, and looked over his shoulder, and read it partially herself; that it then contained the word "*square*." This witness being requested to give the contents of said article, repeated it *verbatim*, as for as the word *square*, but could go no further. Witness further sta- stated that the article was dated in 1841, and that she had not seen it, or heard it read since, but had heard it frequently spoken of.

Another witness testified that he had subscribed to an article having for its object the destruction of wolves, written by one Snodgrass; and that article only included all wolves killed within fifteen miles square of Green Moore's; this witness was at Rowland's infair, and saw the article in dispute; and seeing his name to it, without his authority, and suspecting some change, he examined it, but found it with the word *square* in it, not erased.

A witness was examined to discredit the testimony of Miss Coalter. During the progress of this examination of witnesses, the defendant offered to file a new bond, similar to the one first proffered; and also offered to prove the solvency of the persons named in said bond, but the court overruled the motion; and to this an exception was taken.

The deposition of Estis proved that he, the witness, wrote the article of agreement in controversy, sometime in the latter part of 1840, at the house of one Rowland, that he wrote it with the word *square* in it, but at the suggestion of Green Moore, he erased it; that this erasure was made before the name of any subscriber was put to it; that he read it afterwards at the house of Coalter, and at the request of Young Coal- ter, the defendant placed his name to it.

The court gave the following instructions at the instance of the de- fendant:

---

Matthews vs. Coalter.

---

1. The law presumes the erasure in the article offered by the plaintiff to have been made since its execution, and the jury must take it so to have been done, till the plaintiff removes that presumption by satisfactory evidence.

2. The article is the basis of the plaintiff's action, and if the jury find that said article has had the word *square* erased since the defendant signed the same, and without his consent, it is void as to him.

3. If the jury are not satisfied from the evidence in this cause, that the erasure in the article offered in evidence, was made before the defendant signed his name thereto, or since that time with his consent, they must find for the defendant.

4. Anything done or said in relation to the contents of the article of agreement by any one having at the time the use or possession of the same, for the purpose of obtaining subscribers, and at the same time reading the same, is evidence for the consideration of the jury.

It appears from the record, that there were several mistrials, and that a verdict was finally rendered, by consent, by a majority of the jury. The verdict was for the defendant, and after an unsuccessful motion for a new trial, judgment was rendered in the circuit court on the verdict.

1. The first assignment of error we will notice, is the refusal of the circuit court to permit a new bond for costs to be filed, with a view to let in the testimony of Green Moore, who was the plaintiff's security in the first bond. There is no doubt of the propriety of permitting such substitution, when a suitable state of facts is presented. The refusal of the court in this case, it seems, was based upon the insufficiency, or defectiveness of the new bond; what the specific objections to the new bond were, does not appear, and we therefore presume them to have been substantial and valid objections.

During the progress of the trial, and after a portion of the witnesses had been examined, a similar bond was again tendered to the court, having in view, as we may presume, a similar object. This untimely application met with the same fate. The propreity of admitting the substitution of a new bond in lieu of the first one given, at this stage of the proceedings, with a view to let in the obligor or security, upon the original bond as a witness, must necessarily depend upon the circumstances of the case. If the witness thus sought to be introduced had been present in court during the whole investigation, and no effort to render him competent had been made previous to the trial, a court might very well hesitate to permit the release of the witness, especially in a case which in its progress had exhibited the most palpable contra-

dictions of witnesses. Such a permission, at such a time, might operate to the prejudice of the opposite party, who not being apprized of such an intention to use the witnesses thus rendered incompetent by his adversary's consent, might in this way have been prevented from taking steps to procure his exclusion from the court house during the examination of the other witnesses. Where, however, the attempt to get the witnesses released has been made in good faith, at the earliest period practicable, and that attempt has failed through mere formal objections to the execution of the proffered bond, we know of no reason why the party should not be permitted at a later period to get the benefit of his witness, notwithstanding such witness may have been among the bystanders at the trial, and heard the contradictory evidence of the examined witnesses. Such indulgences are, however, discretionary, and the judge who presides at the trial, and observes the conduct of the parties, can better exercise that discretion than the court of review, having before it only the report of the trial on record.

2. The propriety of admitting Haliburton's testimony is the next question presented by the record. As original evidence to establish an erasure it was incompetent; for Green Moore, who had possession of the paper and read it, would be the best witness to prove that fact. But considering this transaction as a continuous one, from the time the subscription paper was written until it was closed, we are disposed to regard what was said and done by persons having the paper with a view to procure subscribers, as a part of the res gestæ. It is upon this principle, that what passed at Rowland's when the subscription paper was read, was only admitted; and upon the same principle the witness Haliburton might testify about the facts that transpired at Centreville, though neither plaintiff nor defendant were present. As to what the witness said about Lowry, it was explanatory of the mode in which he received an impression that an alteration was made in the paper at that time, though its materiality does not appear upon the record, there being no evidence to show where or at what distance from Green Moore's, Lowry did reside.

3. The instructions to the jury were calculated to give the defendant the benefit of every doubt which the conflict of testimony may have created. The law presumes honesty of purpose and of action, until the contrary is shown. The ancient rule of evidence was, therefore, to presume alterations and erasures of written instruments to have been made at the time of, or anterior to their execution; Bailey vs. Taylor, 11 Cond. R. 531—Judge Cowen's note and authorities there cited; Phil. Ev. vol. 1, p. 299. And although considerable diversity of opin-

ion has been manifested in modern cases, the weight of authority is decidedly in favor of the ancient rule; *omnia presumuntur legitime facta donec probitur in contrarium.* There are exceptions to this rule, but it does not appear that the present case is one of them. Where an alteration or erasure appears suspicious on its face, as if the ink differ, or the hand-writing be that of a holder interested in the alteration, it must be explained. Professor Greenleaf thus states the doctrine: "If nothing appears to the contrary, the alteration will be presumed to be co-temporaneous with the execution of the instrument. But if any ground of suspicion is apparent upon the face of the instrument, the law presumes nothing, but leaves the question of the time when it was done, as well as that of the person by whom, and the intent with which the alteration was made, as matters of fact to be ultimately found by the jury. These questions are of course first determined by the court, when they are raised upon a preliminary objection to the introduction of the instrument, but they are again open to the jury;" Green. Ev. 600.

Judgment reversed and cause remanded.