VAN B. ELZEA et al., Appellants, v. FRANCES C. DUNN et al., Appellants.

Division One, April 6, 1923.

1. **SETTING ASIDE DEED: Mental Incapacity: Insufficient Evidence.** At the time of his death deceased was eighty-six years of age, and three years previously he had made a deed conveying his real estate to a niece. Eight lay witnesses for plaintiffs expressed the opinion that he was of unsound mind during the four or five years preceding his death, and testified that the niece had so stated to them on divers occasions during said period, which statements she denied. Six of said witnesses were plaintiffs and interested parties, and based their opinions for the most part on the circumstance that he would collect glistening rocks and say there was mineral in them. Thirteen of the witnesses for plaintiffs, three of them plaintiffs, substantially admitted and expressed the opinion that he was always of sound mind. More than fifty

Elzea v. Dunn.

witnesses for defendants, including lift-long friends and associates, neighbors, farmers, bankers, physicians, real estate dealers and insurance agents, testified that he was never mentally incompetent until paralized a few days before his death, and that he was more than ordinarily intelligent, forceful, strong-minded and self-reliant, and their testimony was fortified by his purchase of other real estate and important business transactions after said conveyance, which showed a high degree of business acumen. *Held*, that the plaintiffs failed to sustain the burden of proof that he was of weak and unsound mind at the time he made and delivered the deed to his niece.

2. ————: **Undue Influence: Housekeeper.** Deceased, a bachelor, was eighty-three years old at the time he made a deed to his niece, whom he had reared from the time she was three years old and who lived with him until she was married. Three years later he induced her to leave a comfortable home to become his housekeeper, which she faithfully remained for thirteen years, until his death. Seven years prior to his death he made a will, in which he gave her a substantial preference over his other relatives in the same degree. Two years later he added a codicil to his will, in which he spoke of her as having been "in domestic control and charge of his household," and directed his executors to repudiate any claim for services or demands for recompense made by any legatee, and declared that any such legatee should be wholly barred from receiving any bequest or benefit from his estate, and there is no contention that said niece had anything to do with the execution of the will or codicil. Fourteen months later he executed the deed in controversy, by which he conveyed to her his homestead and the greater part of his other real estate. Two years after the execution of said deed and after she had been in possession and receiving the rents from said property, they established a joint bank account. Prior thereto she had occasionally receipted for rents in his name, and turned the receipts over to him, and a few times she assisted him in a clerical capacity. *Held*, that he virtually stood in *loco parentis* to her, and these facts are not sufficient to establish a fiduciary relation, or undue influence. *Held*, also, that the mere relation of housekeeper to a householder is not alone sufficient to establish a fiduciary relation.

3. ————: ————: **Character of Proof.** There being no fiduciary relation between the grantor and grantee, a mere suspicion is not sufficient to establish the grantee's undue influence in the procurement of a deed, but a court of equity requires clear, cogent and convincing proof and circumstances. Mere suggestions concerning insurance and the purchase of other property, especially if resented, and the influence that comes from high personal re-

Elzea v. Dunn.

gard, are not improper, and therefore no evidence of undue influence.

4. **ERASURES: Change in Date of Deed: Presumption.** The legal presumption is that erasures in a deed, not suspicious on its face, were made before its execution. Where the deed was dated December 28, 1915, and the date was changed to December 28, 1914, and the scrivener testifies that the figures "1915" were his mistake and he changed them, on December 28, 1914, to the true date, and gives a reasonable explanation of the mistake and his notary's certificate recites that his commission expired on September 27, 1915, it will not be held, in the absence of other evidence, that the change in dates was made after the instrument was executed.

5. **SETTING ASIDE DEED: Fraud: Agent for Both Parties.** Fraud may be proven by circumstances, but where the transaction may consist as well with honesty and fair dealing as with a fraudulent purpose it will be attributed to the better motive. And in this case the evidence is reviewed and it is held (1) that it fails to establish that the scrivener who drew the deed was secretly the agent of the grantee while employed as the agent of the grantor; (2) that a deed adopting the grantee as the grantor's child was made after the conveyance was made, and therefore the charge that the adoption was fraudulent falls to the ground; (3) that another deed conveying other property made two years later by the same grantor to the same grantee, and by her conveyed the next day to the scrivener, was not made in payment of the scrivener's fraudulent intervention in her behalf at the time the deed in suit was executed; and (4) that said scrivener was the agent of said grantor, and not the agent of the grantee, in procuring a lawyer to draw up a deed of adoption made nearly a year after the deed in suit was executed.

6. ————: **Contract for Services: Ignored in Prior Will.** A will, made by the grantor a few years prior to his conveyance to his niece, in which he made no mention of a contract to the effect that if she would leave her comfortable home and become his housekeeper and care for him until his death he would convey to her his home place, does not show that there was no such contract, especially where he practically abandoned the will, and by deed carried out the vital provisions of the contract by conveying to her said home place and other property.

Appeal from Hannibal Court of Common Pleas.—*Hon. A. H. Waller*, Special Judge.

REVERSED AND JUDGMENT DIRECTED FOR DEFENDANT.

*Berryman Henwood, David H. Ely* and *Ben. E. Hulse* for plaintiffs.

(1)   A close confidential and fiduciary relation existed between deceased and defendant, at the time the deed in controversy was executed, and the presumption arises, by reason of such relation, that the execution of said deed was the result of undue influence and fraud; and the burden is cast upon the defendant to satisfy the chancellor, by such clear and cogent proof as to leave no room for reasonable doubt, that the transaction was for an adequate consideration, and in all respects fair, and in fact free from and not brought about by the exercise of undue influence.   Garvin v. Williams, 44 Mo. 465; Cadwallader v. West, 48 Mo. 483; McClure v. Lewis, 72 Mo. 314; Martin v. Baker, 135 Mo. 495; Dingman v. Romine, 141 Mo. 466; Studybaker v. Cofield, 159 Mo. 596; Kinney v. Murray, 170 Mo. 674; Grantham v. Gossett, 182 Mo. 671; Rosenwald v. Middlebrook, 188 Mo. 58; Goodin v. Goodin, 172 Mo. 40; Cornett v. Cornett, 248 Mo. 234; Turner v. Butler, 253 Mo. 202. (a) The undue influence exercised in the making of a will is not the proper standard for testing that influence in the making of a contract or a deed between the living. In making a contract, the mind and will of one party necessarily comes in contact with those of the other, and may thereby be unduly influenced or entirely overcome.   Ennis v. Burham, 159 Mo. 518; Hurley v. Kenally, 206 Mo. 292.   (2)   Even if the proven facts in the case in relation to the original contract, if any, alleged to have been made between Henry S. Elzea and Frances C. Dunn, in pursuance of which she claims the deed was executed, would call for the vesting of the title to the homestead property in said defendant, her fraudulent acts and conduct in connection with the execution of the deed, and the change made therein after the same was executed, as shown by the testimony, bar her of any relief to which she might be entitled in the absence of such fraudulent acts and conduct.   The application in

this case of the oft quoted and approved maxim of equity, "he who comes into equity must come with clean hands," leaves Mrs. Dunn outside of the pale of any relief. 16 Cyc. 144-148; 21 Corpus Juris 180, sec. 163-179; Creamer v. Bivert, 214 Mo. 473; Gilmore v. Thomas, 252 Mo. 147; Gammage v. Latham, 222 S. W. 471. (3) The deed in controversy was rendered absolutely void by reason of the change made therein, after its execution, by Frances C. Dunn, through and by her agent Gilbert, such change being made without the knowledge or consent of the said Henry S. Elzea; and on no theory of the law can the court confirm said deed as a valid conveyance of the homestead property to the said Frances, Any alteration of a written instrument made in the absence of the party executing it, by one beneficially interested therein and having the custody thereof, is fatal to its validity. Haskell v. Champion, 30 Mo. 136; Evans v. Foreman, 60 Mo. 449; German Bank v. Dunn, 62 Mo. 79; Moore v. Hutchinson, 69 Mo. 429; Morrison v. Garth, 78 Mo. 434; Hord v. Taubman, 79 Mo. 101; Bank v. Fricke, 75 Mo. 178; Kelly v. Thuey, 143 Mo. 422; Powell v. Banks, 146 Mo. 620; Koons v. Car Co., 203 Mo. 227, 259; Moore v. Macon Saving Bank, 22 Mo. App. 684; Bank v. Bosserman, 52 Mo. App. 269; Investment Co. v. Scales Co., 277 Mo. 365, 376.

*Rendlen & White* for respondent.

(1) Stripped of all collateral matters and spurious and false issues injected in a vain endeavor to distract and confuse, the real issue in this case resolves itself into this question: Was the mental capacity of Henry S. Elzea sufficient at the time this deed was made to enable him to make it? (a) The presumption is that Henry S. Elzea was sane, and it devolves on the plaintiffs to prove that he was of unsound mind at the very time the deed was made, by the preponderance of the testimony. Parties impeaching a deed must prove grantor's incapacity. McFarland v. Brown, 193 S. W. 804; Chad-

well v. Reed, 198 Mo. 379; Jones v. Thomas, 218 Mo.
542; Richardson v. Smart, 162 Mo. 623; Studybaker v.
Cofield, 159 Mo. 596.   (b)  If Mr. Elzea was of sound
mind, he had a right to dispose not only of the property
he did convey, but of all of it, as he chose.  Chadwell
v. Reed, 198 Mo. 383; Richardson v. Smart, 152 Mo.
637; Hamlett v. McMillin, 223 S. W. 1072; Studybaker
v. Cofield, 159 Mo. 616.  (c)  Rocks and hallucinations
(if the court could be persuaded Elzea really had them)
don't invalidate the deed. The hallucination if any, and
his hobby for rock specimens and minerals, must exist
at the time the deed was made, and in addition must di-
rectly effect the act of making the deed or relate to the
property and transaction involved in order to incapaci-
tate or render void the deed.  Cutler v. Zollinger, 117
Mo. 101; Masterson v. Sheahan, 186 S. W. 524; Mc-
Farland v. Brown, 193 S. W. 804.  (d)  Whether grantor
possessed mental capacity sufficient to make this deed
should be determined by rule applicable to wills.  The
contract was made about ten years before the deed was
drawn as to the acreage land.  The Courtney property
was a gift.  Conveyances made on previous promise to do
so for care and housekeeping rendered, are determined
by the rule applicable to gifts.  Masterson v. Sheahan,
186 S. W. 524; Chadwell v. Reed, 198 Mo. 359; Richard-
son v. Smart, 162 Mo. 623.  (e)  "The grantor in a deed
may be extremely old, his understanding, memory and
mind enfeebled by age, and his actions occasionally
strange and eccentric, and he may not be able to transact
many affairs of life; yet if it has not rendered him
imbecile, so that he does not know the nature and effect
of the deed, this does not invalidate the deed.  If he is
capable at the time to know the nature, character and
effect of the particular act, that is sufficient to sustain
it."   Chadwell v. Reed, 198 Mo. 382; McKissock v.
Groom, 148, Mo. 459; Sinnett v. Sinnett, 201 S. W. 889;
Hamlett v. McMillin, 223 S. W. 1069.  (f)  There is no
business transaction of Elzea's entire life that warrants
an "opinion" that he was incompent.  No one who ever

transacted business with Elzea during the years in question thought him incompetent. Three witnesses for plaintiff ventured that in the fall of 1916 he was childish and was not entirely sound but they had no business dealings with him. These "opinions" were predicated on state of facts that do not show incompetency. These "opinions" amount to nothing and give no force to such facts. Winn v. Grier, 217 Mo. 449; Wood v. Carpenter, 166 Mo. 487; Crownson v. Crownson, 172 Mo. 700; Sehr v. Lindermann, 153 Mo. 288; Fulbright v. Perry County, 145 Mo. 443; Riley v. Scherwood, 144 Mo. 364; McFadin v. Catron, 138 Mo. 216; Hughes v. Rader, 183 Mo. 704; Lee v. Lee, 258 Mo. 612. (2) While actual fraud was claimed in the petition, none was proved. Plaintiff relies upon the relationship of the parties, arguing that from it confidential relationships exist, which shifts the burden of proof from plaintiff, where otherwise it rests on the defendant, to show the transaction was not produced by overreaching and was the free and deliberate act of Elzea, resulting from his spontaneity, not coerced by Mrs. Dunn. (a) Mrs. Dunn's position in Elzea's home as his housekeeper and niece raises no presumption of undue influence or of confidential business relations or over-persuasion, nor does it raise a presumption of invalidity of the deed. Undue influence is never presumed from a relationship which the law sanctions and approves. Bonsal v. Randall, 192 Mo. 531; Land v. Adams, 229 S. W. 158; Spencer v. Spence, 221 S. W. 58; Spurr v. Spurr, 226 S. W. 39; Huffman v. Huffman, 217 Mo. 182; Hamilton v. Armstrong, 120 Mo. 614; McKissock v. Groom, 148 Mo. 467; Maddox v. Maddox, 114 Mo. 48; Doherty v. Noble, 132 Mo. 29; Riley v. Sherwood, 144 Mo. 366; Aylward v. Briggs, 145 Mo. 614; Masterson v. Sheahan, 186 S. W. 526; McKinney v. Hensley, 74 Mo. 332; Lee v. Lee, 258 Mo. 613; Jones v. Thomas, 218 Mo. 537; Turner v. Butler, 253 Mo. 218. (b) That the deed was the product of good faith, is conclusively shown by the fact that it corresponded, when made, with Henry Elzea's long formed and often

expressed purpose. It accomplished the object he had long intended as to his property. It shows the condition of his mind, state of his affections. His declarations show "a fixed and settled purpose on his part to make a certain disposition of his property, and it also tended to show that he knew what he had done and was satisfied with that disposition of his property." Hamilton v. Armstrong, 120 Mo. 610, 621; Huffman v. Huffman, 217 Mo. 194; Bonsal v. Shehan, 186 S. W. 525; Doherty v. Noble, 138 Mo. 29; Aylward v. Briggs, 145 Mo. 608, 613; Rule v. Maupin, 84 Mo. 590; Jones v. Thomas, 218 Mo. 543. (c) Mere fact deed was from uncle to niece, father to child, makes no case of undue influence, is no evidence thereof, let alone the exercise of it. Burden of proof does not shift from plaintiffs to defendant, those alleging undue influence and fraud must prove it. Lee v. Lee, 258 Mo. 613; 18 C. J. 232; Hamlett v. McMillin, 223 S. W. 1074; Hatcher v. Hatcher, 139 Mo. 624; Doherty v. Noble, 138 Mo. 32; Land v. Adams, 229 S. W. 158; Sinnett v. Sinnett, 201 S. W. 887; Bonnett v. Ward, 272 Mo. 671. (3) Where services rendered are of such peculiar character that it is impossible to measure their value by any pecuniary standard, and where it is evident parties did not intend to measure them by any such standard, it is impossible adequately to compensate the party performing the services except by a decree for specific performance, specific performance will be decreed. Berg v. Moreau, 199 Mo. 416; Grantham v. Gossett, 182 Mo. 651; Hall v. Harris, 145 Mo. 614; Hornback v. Berger, 133 Mo. 24, 31 L. R. A. 810; Carney v. Carney, 95 Mo. 353; Sharkey v. McDermott, 91 Mo. 647; Hiatt v. Williams, 72 Mo. 214; Studybaker v. Cofield, 159 Mo. 596; 36 Cyc. 673. (4) The law presumes the erasure was made before the execution of the deed. Matthews v. Coalter, 9 Mo. 411; Holton v. Kemp, 81 Mo. 665; Burnett v. McCluey, 78 Mo. 687; Grimes v. Whiteside, 65 Mo. App. 3; Little v. Herndon, 10 Wall 26; Hanrick v. Patrick, 119 U. S. 156, 30 L. Ed. 396. (a) A notary is an officer of the State. Sec. 10177,

R. S. 1909. Among the officers in favor of whose action a presumption of regularities has been extended, are notaries of the public. 16 Cyc. 1079. It is presumed that the officer properly performed his duty in taking the acknowledgment. 1 Cyc. 595; Wannell v. Kem, 57 Mo. 478; Bohan v. Casey, 5 Mo. App. 101; 1 Cyc. 623, 624; Springfield Engine Company v. Donovan, 147 Mo. 622; Barrett v. Davis, 104 Mo. 549, 555; Webb. v. Webb, 78 Mo. 540. (5) If this were just a case of specific performance the court would compel a conveyance of the acreage property described in the deed to Mrs. Dunn. Burnett v. Hudson, 228 S. W. 464; Gupton v. Gupton, 47 Mo. 37; Hiatt v. Williams, 72 Mo. 214; Berg v. Moreau, 199 Mo. 416; Wright v. Tuisley, 30 Mo. 389; Sutton v. Hayden, 62 Mo. 101; West v. Bundy, 78 Mo. 407; Sharkey v. McDermott, 91 Mo. 647; Healey v. Simpson, 113 Mo. 340; Hall v. Harris, 145 Mo. 614; Alexander v. Alexander, 150 Mo. 579.

SMALL, C.—Petition filed June 3, 1918. Suit in equity to set aside deed made by Henry S. Elzea for certain lands to defendant, Frances C. Dunn, Mr. Elzea died January 24, 1918, at the age of 86 years. The plaintiffs, some eighty in number, are the collateral heirs, nieces and nephews of said Henry S. Elzea. Defendant, Frances C. Dunn, is also a niece. The land described in the deed consists of three pieces, one containing about 25 acres, on which his residence was located; another piece of 20 or 25 acres, adjoining and across a creek and road therefrom; and a third piece, described in the evidence as the Courtney property, which was business property in the city of Hannibal. The acre property adjoins said city.

The petition charges that said deed was made "on December 28, 1914, or on some day between said 28th day of December, 1914, and the 28th day of December, 1915." That defendant, Frances C. Dunn, sustained a fiduciary relation to said Elzea, and secured said deed by fraud and undue influence, and that said Elzea was

mentally and physically weak and incompetent from old age and sickness to make said deed. That by his will duly probated on January 28, 1918, he devised certain business property in Hannibal to said Frances C. Dunn, and ten acres of the land sued for to the Home of the Friendless, and, in effect, all the balance to his brothers and sisters, or if dead, to their heirs, *per stirpes,* except that defendant Dunn was to share equally with his brothers and sisters. That the property conveyed by said deed was worth $30,000, and constituted the major portion of all the property then owned by said Elzea.

The answer of defendant Frances C. Dunn admits that said Elzea died on the 24th of January, 1918, testate, a bachelor, and leaving, as his collateral relatives, the plaintiffs and defendants named in the petition, but denies that they were the next of kin. Alleges that the defendant Frances C. Dunn was duly adopted by said Henry S. Elzea, by deed of adoption, executed the 22nd day of December, 1915, and that as such she is his sole and only heir at law.

Said answer then puts all the other allegations of the petition in issue, and alleges: That said deed was made December 28, 1914, and not December 28, 1915, and was made to her pursuant to a contract with the deceased made fourteen years before his death to convey all the acre property described in said deed and "other property" to her, if she would live in his home and manage the same for him until he died. That she accepted and fully performed on her part the said contract, and was the absolute owner of the property so conveyed to her by said deed.

The cause was tried by a special judge, who, after taking it under advisement, found that the contract, as alleged by defendant Frances C. Dunn in her answer, was made by said Elzea, except that he only agreed to give Mrs. Dunn his home place, which consisted of his residence and the 25 acres of land on which it was located, but no other land. That she fully performed the contract on her part and was entitled to said resi-

dence and 25 acres, but not the additional property described in said deed. That the deed to her was made by Elzea, December 28, 1915, and not December 28, 1914. The court further found "that there was no fraud or undue influence on the part of said Frances C. Dunn, or her agent, to obtain the grant in said deed, as to said home place, but that said Henry S. Elzea knew he was conveying said home place, and did so in fulfillment of a promise made prior to said Frances C. Dunn becoming a member of his household and care-taker."

The court further found, however, "that from about the year 1914, down to the time of his death, the said Elzea was weak and infirm in body and mind by reason of old age, sickness and disease," and was easily influenced by defendant Frances C. Dunn, in his business affairs and disposition of his property, and she unduly and fraudulently influenced him, to include the Courtney property and 25 acres adjoining the home place on the west in said deed, in addition to said home place, and that as to all property, except the home place, the deed was void.

Both parties appealed from the judgment of the learned chancellor.

There were 116 witnesses who testified at the trial, about 86 for the defendants and 30 for the plaintiffs. The abstract of the record is very voluminous, containing more than a thousand pages. It is impossible to undertake to set out the testimony. We can only consider it in discussing the questions raised on appeal.

I.    The testimony was overwhelming that the deceased was never of unsound mind up to within a short period of his death. He died, after being sick only for a few days from paralysis, on January 24, 1918. Out of about thirty witnesses who testified for plaintiff, only about eight expressed the opinion, and they were lay witnesses, that he was of unsound mind during the four or five years, or at all, preceding his death. These witnesses all testified that Mrs. Dunn so stated to them on divers occasions

<span style="float:left">Mental Incapacity.</span>

during said period, which, however, she denied, although not permitted to testify to any conversation or transaction with the deceased. Six of these witnesses so testifying to want of mental capacity on the part of Mr. Elzea, were plaintiffs and interested parties. They also based their opinions, for the most part, on such trivial circumstances as that he would collect rocks about the place, and claim there was mineral in them, and said to one of them that there was gold and silver and diamonds in them. The rocks glistened in the sun, but they contained no such precious minerals. He also claimed to others, that the rocks had petrified frogs and other small animals in them.

About thirteen of plaintiffs' own witnesses substantially admitted and expressed the opinion that the decedent was always of sound mind; three of these witnesses were plaintiffs in the case. The other witnesses for the plaintiffs did not testify as to the decedent's mental capacity. More than fifty witnesses for the defendants, including life-long friends and associates, neighbors, farmers, bankers, physicians, real estate and insurance men and others, not related to any of the parties, testified, in substance, that deceased never was mentally incompetent until he received a stroke of paralysis a few days before his death, and that he was more than an ordinarily intelligent, forceful, strong-minded and self-reliant man, of fine character and good business ability. There is no evidence in the case that he ever manifested any mental inability to do business until his last sickness.

A number of the plaintiffs themselves joined with him in selling lots in Elzea's Addition to the City of Hannibal nearly every year for eight or ten years before his death; the last deed made by him and them being dated January 2, 1917. He represented most of the Elzea heirs, consisting of himself and the plaintiffs or their fathers and mothers, as their attorney in fact in selling and conveying these lots. He fixed the price and sold the lots himself. He had settlements with the heirs

each year, and paid them what was coming to them, for which he had them sign receipts in a book kept for that purpose. On December 4, 1914, the same month the deed in suit was made, he purchased the Courtney property for $10,000, because he considered it a good bargain and borrowed $8,000 from the bank to add to $2,000, which he had on hand, to pay for the property. All of the evidence showed that he made a good purchase. He employed a real estate agent to rent and collect his rents from improved property in Hannibal, of which he had a number of pieces. Robert N. Gilbert was his agent for this purpose from 1912 until his death. He paid his own taxes, attended to his own insurance and made his own loans, at least, until the year before his death. He made a codicil to his will October 15, 1913, about a year and three months before he made the deed in suit. It is not contended that he was mentally deficient at that time. Nothing especially happened or changed his condition between the time he made this codicil and when he made said deed. It is true, the evidence shows, that his body became weaker, as the years advanced, but he was not laid up or confined to his house for any length of time. He had a large growth or wen upon his neck for some years before his death, which no doubt, annoyed him, but did not affect his mentality. Otherwise, he apparently had no serious illness for many years before his death, and his mind was good, except for the natural forgetfulness of old age, until he received the stroke of paralysis from which he died.

The deed in controversy was recorded July 28, 1916. The bank from which he borrowed the $8,000 to pay for the Courtney property, ascertaining that he had made the conveyance, asked him to give security for said note, which he did by executing a deed of trust on some other property, including the property devised to Mrs. Dunn for her support by his will. When the deed of trust was presented to him by the bank's agent to sign, who read to him the description of the property conveyed, and explained to him that they wanted him to secure his

note, he signed it without hesitation and understood what he was doing. This was the 11th day of May, 1917. The evidence shows that he was fully as well, if not better, preserved, mentally and physically, though somewhat enfeebled and forgetful, than the average man of his age up to the time of his fatal illness in January, 1918. It was three years before his death that the deed in suit was executed, and in the same month, when he was transacting some of the most important business, so far as the record shows, he ever transacted, to-wit, purchasing the $10,000 Courtney business property, borrowing $8,000 to complete the purchase, and making a good and safe bargain, all on his own independent judgment.

We think plaintiffs have wholly failed to sustain the burden of proof, which was upon them to show that Mr. Elzea was of unsound or weak mind at the time he made and delivered the deed in controversy.

II. Does the evidence establish that Mrs. Dunn occupied a fiduciary relation to Mr. Elzea when the deed in question was made and delivered? We do not think so. She was raised by the decedent from the time she was three years old. He was an old bach-

**Undue Influence.** elor. She lived with him until she was married; and afterwards, how long does not appear, but from all the evidence, it must have been only a few years, he induced her to leave a comfortable home in St. Louis to become his housekeeper, which she faithfully remained for thirteen years, until he died.

We are satisfied from the evidence, that he did not regard her as a business adviser, or rely upon her in any way to manage his property and business affairs. His will made in 1911 gave her a substantial preference over his other relatives in the same degree, and in the codicil to said will, made the 15th day of October, 1913, he speaks of his household of which "Fannie Belle Dunn has been in domestic control and charge." And he further in said codicil declares that, if any beneficiary named in his will shall file any claim for services against his

estate, or make demands for recompense, he directs his
executors to repudiate any such claim, and provides that
such beneficiaries shall be barred from receiving any be-
quests, or benefits from his estate, direct or indirect.
There is no contention by the plaintiffs that Mrs. Dunn
had anything to do with the execution of this will, and
especially not of the codicil. The deed in question was
executed only a year and two months and a half after the
codicil was made. There is no evidence that Mrs. Dunn
acquired a new legal relationship to him in the meantime.
We think she 'remained simply "in domestic control"
of his household, and not of his business, at least until
the joint bank account was established in January, 1917,
which was two years after the execution of the deed in
question, and she had been in possession of and had re-
ceived the rents and profits of the property. There is
some evidence that a few times she would assist him in
a clerical capacity, and prior to 1909, on several oc-
casions, receipted for rents in his name and turned them
over to him. It is also true, that some of plaintiffs' wit-
nesses, nearly all interested parties, testified that Mrs.
Dunn claimed she attended to all or most of his business,
but she denies making such statements, and the other evi-
dence in the case shows it is not true, because he himself
and Gilbert attended to all the business of any conse-
quence which he had. The relation of a mere housekeep-
er, doing no more business for the householder than Mrs.
Dunn did for Mr. Elzea, in view of the circumstance that
he stood virtually in *loco parentis* to her as his only child,
is not sufficient to create a fiduciary relation between
the housekeeper and the householder. [Hamilton v.
Armstrong, 120 Mo. 614, and cases cited; Hamlett v.
McMillin, 223 S. W. 1074; Land v. Adams, 229 S. W. 158,
and cases cited; Doherty v. Noble, 138 Mo. 29; Bonsal
v. Randall, 192 Mo. 525.]

· We rule this point against plaintiffs.

III. There being no fiduciary relation, as we have
just found, the burden of proof rests upon the plaintiffs

to sustain the charge in their petition that Mrs. Dunn exercised undue influence in the procurement of her deed. Mere suspicions are not sufficient. A court of equity requires clear, cogent and convincing evidence and circumstances to discharge such burden. [Hamilton v. Armstrong, 120 Mo. 597, and other cases cited in the preceding paragraph.] We can find no such evidence in this record. Mrs. Dunn was not present and had no part in the execution of the deed, so far as shown by the evidence. It was made by the decedent, of his own suggestion, and with the aid of his own agent, Robert N. Gilbert. There is evidence that she could not have unduly influenced him, had she endeavored to do so. This is strongly indicated by the codicil to his will. Moreover, the only two times, shown in evidence, when she made any suggestions to him with reference to his business or property, once as to certain insurance, and once when he bought the Courtney property, he promptly informed her he was attending to his own business. We have no doubt that she influenced him out of his regard for her and of his obligations to her, but that she did or could *unduly* influence him is without support in the record. It is not proper or due influence, but *improper* or *undue* influence, which amounts to virtual coercion or the substitution of the grantee's will for that of the grantor, which the law denounces and which will invalidate a deed or will. [Huffnagle v. Pauley, 219 S. W. 378; Hern v. Dysart, 220 S. W. 910, 911; Land v. Adams, 229 S. W. 163.]

**Undue Influence: Proof.**

We rule this point against plaintiffs.

IV. One of the most important questions in this case is, whether or not the date of the deed in suit was wrongfully changed by Robert N. Gilbert (who drew the deed) after it was executed, as charged by plaintiffs, from the 28th day of December, 1915, to the 28th day of December, 1914. The deed itself has been inspected by us, and the erasures and corrections in the date thereof appear, as

**Changing Date of Deed.**

stated by Gilbert in his testimony, which was, that the deed was dated by mistake December 28, 1915, and he changed it to December 28, 1914, the true date the deed was made, at the time of its execution. He testified that it was a mere clerical error, and explained that it might have come about because he was also in the insurance business, and that being near the end of the year he had previously renewed a number of policies of insurance, dating them 1915. Other deeds made by him, in evidence, showed erasures and corrections. There is nothing in his testimony to cast suspicion on its truthfulness, but there is a circumstance which confirms it. Gilbert was also a notary, and took the acknowledgment. He states in his certificate that his "term expires September 27, *1915*." There has been no erasure in any part of the acknowledgment, except in its date; it was dated, like the deed in the first place, December 28, 1915, and the figures "15" were erased and "14" written in their place. It is clear, therefore, that if the deed was made on December 28, 1915, as the deed and its acknowledgment were originally written, it would have been acknowledged three months after Gilbert's commission as notary had expired. But the evidence shows, while his commission did expire on September 27, 1915, it was again renewed on that date for the further term of four years prescribed by the statute. There was, therefore, either a mistake in the date of the deed, as testified to by Gilbert, or a mistake in the acknowledgment in stating when his term as notary expired. There is no evidence that it was the latter. The law presumes that erasures in a deed, not suspicious on their face, were made before the deed was executed. [Matthews v. Coalter, 9 Mo. 696; Holton v. Kemp, 81 Mo. l. c. 665; Burnett v. McCluey, 78 Mo. l. c. 684, 687; Grimes v. Whitesides, 65 Mo. App. l. c. 3; Little v. Herndon, 10 Wall. 26, 19 U. S. 878; Hanrick v. Patrick, 119 U. S. 156, 30 U. S. 396; Paramore v. Lindsey, 63 Mo. 63.] The erasure and correction here made left the acknowledgment valid as having been taken before the notary's commission expired, which is

not a suspicious circumstance, but a circumstance confirming Gilbert's testimony that the erasures and corrections in the date of the deed were made, as stated by him.

The revenue stamps on the back of the deed were initialed "H. S. E. 1915," and not changed. But, as the deed was not to be delivered or recorded until requested by Mr. Elzea, and 1915 was ushered in three days after the deed was made, the stamps may well have been put on in 1915; Gilbert was not interrogated as to that. This does not overcome the confirmation of Gilbert's testimony afforded by the recital in the acknowledgment that his term as notary expired September 27, 1915.

We rule this point against plaintiffs.

V. Was the deed in suit procured by fraud by Mrs. Dunn? We think not. The only direct testimony relating to the making of said deed was given by Gilbert. He was a man about sixty years of age, and had been in the real estate and insurance business in Hannibal for many years. He and Mr. Elzea were members of the same church. From 1912 Gilbert collected all of Mr. Elzea's rents until his death, and rented and attended to the repairs of his property. Mr. Elzea gave him a written power of attorney to do so June 7, 1916. Prior to that time, he acted under verbal authority. He also assisted Mr. Elzea in making his annual settlements with the Elzea heirs on account of lots sold by Mr. Elzea in Elzea's Addition. One of these settlements was made on the 28th day of December, 1914, at which a number of the plaintiffs were present and participated and receipted on Mr. Elzea's book for the money paid to them. Mr. Elzea himself was present at this settlement and so was Mrs. Dunn, who was also one of the Elzea heirs. This settlement was made at Mr. Elzea's house. After the settlement was over, and he and Mr. Elzea were left alone in the room, Mr. Elzea said to him: " 'I have some property I want to deed to Fannie [Mrs. Dunn]; I promised her that if she would leave her home in St.

Fraud.

Louis and come to Hannibal and make a home for me, I would give her a liberal share of my property, and I am going to make my word good.' He reached down in a box and took out the abstract to the home place, where Mrs. Dunn now lives, and the abstract to the 25 acres across the road from where they lived, and the Courtney property on Market Street, and he said, 'I want you to make a deed to these properties for Fannie. I want to make my word good.' I went back to my office and prepared the deed. Took it back to Mr. Elzea's house. Also took my seal with me, and said to him, 'This is your deed, here are your abstracts, you examine it and see that it is all right.' I found I had made an error in the date of the deed, I had marked it 1915, and it should have been 1914. I rubbed that out in his presence, and after I did so, he signed the deed, and said, 'I want you to take this deed down to the office and keep it until I tell you to have it recorded.' I kept the deed in my office. He signed the deed on the 28th day of December, 1914, and I took his acknowledgment then, I think. I kept the deed in my safe until he told me to put it on record. Quite a while after, he said, 'Now, you had better put this deed on record.' I did so. He told me a great many times he was going to give Mrs. Dunn this property. He always said 'a liberal share of the property.' ''

But it is earnestly argued that Gilbert was secretly Mrs. Dunn's agent, as well as the agent for Mr. Elzea, and that Gilbert did not inform him of his dual capacity, but betrayed Mr. Elzea to favor her. We cannot from the evidence find that Gilbert was Mrs. Dunn's agent, or that he did anything other than follow Mr. Elzea's directions in making this deed. There is no evidence that he ever did any business for Mrs. Dunn, but the evidence is undisputed that he had for years been Mr. Elzea's agent in the renting and the management of his property. There is no evidence that he ever betrayed or tried to betray him or was unworthy of Mr. Elzea's confidence. The principal argument upon which it is claimed that he was Mrs. Dunn's agent, and was faithless to Mr.

Elzea, is based upon the assumption that the deed to Mrs. Dunn was made December 28, 1915, after the deed of adoption of Mrs. Dunn by Mr. Elzea was made on December 22, 1915, and in accordance with Mr. Farris's suggestion to Gilbert that the deed of adoption would not prevent Mr. Elzea from devising or conveying his property to others, and that the only way to prevent that was for Mrs. Dunn herself to secure a deed from Mr. Elzea.

But we are entirely satisfied, and have found, that the deed in suit was made on December 28, 1914. The argument, therefore, falls to the ground, because said deed was made a year before Mr. Farris is alleged to have made such suggestions to Gilbert. He could not, therefore, have acted upon them, neither could Mrs. Dunn, in reference to the deed in question.

Another contention is that in April, 1917, Mrs. Dunn received a deed for a lot in Park Place from Mr. Elzea, which she conveyed the next day to Gilbert; that Gilbert's testimony that he paid Mrs. Dunn $1250 for it, borrowing $850 for that purpose, is false, and that said conveyance was fraudulently obtained by Mrs. Dunn and Gilbert to pay Gilbert for his services in betraying Mr. Elzea in securing the deed in suit. The law is, that fraud, conspiracy and falsehood will not be presumed without or against the evidence, but must be proven by convincing and cogent testimony by the party upon whom rests the burden of proof, which is upon the plaintiffs in this case. While fraud may be proven by circumstances, yet, where the transaction under consideration may as well consist with honesty and fair dealing, as with a fraudulent purpose, it will be referred to the better motive. [Jones v. Nichols, 216 S. W. 962; Garesche v. MacDonald, 103 Mo. 1; Hardwicke v. Hamilton, 121 Mo. 465; Warren v. Ritchie, 128 Mo. 311; McGrath v. Payne, 245 S. W. l. c. 1064.]

The deed to the lot in Park Place was procured more than two years after the deed in question was made, and there was no evidence that Gilbert was not able, or did not pay for the lot, as he said he did. So as to the deed

of adoption: Gilbert testified that Mr. Elzea requested him to have the deed of adoption drawn up and Farris, whom Gilbert procured to draw it, said that Gilbert stated at the time, that it was a gratis matter, and there was no hurry. There is nothing in the testimony of Farris to show that Gilbert was not acting in the matter at the request of Mr. Elzea, as he said he was. The mere fact that Mrs. Dunn would receive the benefit of it, whatever that was, did not show that Gilbert was her agent in that transaction, or that he was her agent in procuring the deed in suit for her a year before the deed of adoption was made.

We rule this point against plaintiffs.

VI. But it is strenuously contended that the will of Mr. Elzea executed in 1911, and the codicil thereto executed October 15, 1913, conclusively show that there was no contract between Mr. Elzea and Mrs. Dunn, as to what she was to receive for her services as his housekeeper, and that, therefore, Mrs. Dunn's claim is simply "conceived in sin and brought forth in iniquity." We do not think so. The will and codicil do not state there was no such contract; all that they may be said to conclusively indicate is, that he did not desire Mrs. Dunn to assert the existence of any such contract after he was dead. There is no evidence that Mrs. Dunn ever saw or knew of the existence of the will or its provisions; it seems to have been securely locked up in the vault of the Trust Company, which he made executor. Mr. Elzea had a right to change his will, either by making a new will, or by conveying by deed the property disposed of by his will. That his will was not considered by him, after he made the deed in suit to Mrs. Dunn, as constituting a fixed provision for her, is shown by the fact that he included the property specifically devised to her thereby for her support in the deed of trust made by him on the 11th day of May, 1917, to secure the $8,000 he borrowed to pay for the Courtney property, which was included in his

*(margin note:)* Omitting Contract from Will.

deed to her.  However, the great weight of the evidence
shows, and the lower court found, in which finding we
concur, that about 1905 he did enter into a verbal con-
tract with Mrs. Dunn, to the effect that, if she would
leave her home in St. Louis, where she was comfortably
situated, and which she had no desire to leave, and re-
turn to his home, and be his housekeeper until he died,
he would give her his "home place."  Some of the wit-
nesses testified that the "home place" consisted of his
residence and the 25 acres upon which it was located;
others, among them one of the plaintiffs, that it consisted
of the residence and the 25 acres upon which it was located
and the adjoining 25 acres, more or less, on the west side
of the creek and road.  That Mrs. Dunn fully and faith-
fully performed her part of the contract there can be no
doubt from the evidence in the record.  Mr. Elzea, in
making the deed to Mrs. Dunn, conveyed to her both
tracts connected with the "home place," as well as the
Courtney property.  He said to Gilbert that "I promised
her, if she would leave her home in St. Louis and come
to Hannibal and make a home for me, I would give her a
liberal share of my property, and I am going to make my
word good."  He then took out the abstracts for the three
pieces of property, included in the deed, and said to
Gilbert, "I want you to make a deed to these properties
for Fannie.  I want to make my word good."  The deed
was then executed and acknowledged by him on December
28, 1914, and left in the custody of Gilbert to be placed
upon record when so directed by Mr. Elzea, which was
done in July, 1916.  A large number of apparently dis-
interested witnesses testified that as early as the sum-
mer of 1915, and afterwards in 1916 and 1917, in the
full possession of his faculties, he told them he had given
the "home place," including both acre tracts connected
with it, to Mrs. Dunn.

The petition alleges that ever after the execution of
the deed to her, Mrs. Dunn "has adversely claimed and
had the exclusive use, possession and occupancy of said
real estate, except said ten acres (devised to the Home

of the Friendless by Mr. Elzea's will), and denying that said Henry S. Elzea, since the execution of said deed, and down to the time of his death,'' had any title to said property. It also appears that Mrs. Dunn made a deed of trust upon the Courtney property, on the 11th of April, 1917, and, as we have seen, he made a deed of trust on the 11th of May, 1917, to secure $8,000, which he borrowed to pay for the Courtney property upon the property which he specifically devised to Mrs. Dunn by his will for her support. The evidence shows that Mrs. Dunn was the only one of the eighty or more of his relatives to whom he was under any obligations or for whom he had any special attachment. She was a part of his home and life from the time she was three years of age. He even called her back to him after she was married. She made a sacrifice to respond to his call and faithfully served him, as the keeper of his house and home for thirteen years afterwards until he died, She stood, in effect, to him as an only child who had devoted the best years of her life to an aged father who had no other family. He even went so far as to formally adopt her in December, 1915, which, in a way, was a mere formality confirming their prior *de facto* relations.

The evidence all shows that he was a man of the highest character, who would not want to die without ''making his word good'' to liberally provide for her. That he did so, is no evidence of fraud or undue influence on the part of Mrs. Dunn, or of mental or moral infirmity on his part. Accordingly, we rule, that the judgment in this case should have been for the defendants.

We, therefore, reverse the judgment below, with directions to the circuit court to set it aside, and enter judgment for the defendants and against the plaintiffs. *Lindsay, C.,* concurs; *Brown, C.,* not sitting.

PER CURIAM:—The foregoing opinion by SMALL, C., is adopted as the opinion of the court. All of the judges concur, except *Ragland, J.,* not sitting.