T. H. THATCHER ET AL. v. ELIZABETH H. LEWIS ET AL., Appellants.

T. H. THATCHER ET AL., Appellants, v. CITY OF ST. LOUIS, Trustee Under Will of BRYAN MULLANPHY ET AL.—76 S. W. (2d) 677.

Division One, November 15, 1934.*

*NOTE: Opinion filed at May Term, 1934, July 17, 1934; motion for rehearing filed; motion overruled at September Term, November 15, 1934.

*Bishop & Claiborne, Curlee & Teasdale, Boyle & Priest, Hugh K. Wagner, Francis M. Curlee, George T. Priest* and *George G. Vest* for appellants.

1132

*Charles M. Hay, Edgar H. Wayman* and *Richard S. Bull* for City of St. Louis.

*Roy McKittrick*, Attorney-General, *Vance J. Higgs* and *Robert J. Keefe* for Attorney-General.

1134

HYDE, C.—This is an action in equity to terminate a trust, created by the will of Judge Bryan Mullanphy, executed in August, 1849, on the ground that "the purpose of said trust has long since wholly failed." By answer and cross-bill the city of St. Louis and the Attorney-General of Missouri asked for an interpretation of the will and for instructions to the trustee. Judge Mullanphy's will was as follows:

"I, Bryan Mullanphy, do make and declare the following to be my last will and testament:

"One equal undivided third of all my property, real, personal, and mixed, I leave to the City of St. Louis, in the State of Missouri, in trust, to be and constitute a fund to furnish relief to all poor immigrants and travelers coming to St. Louis on their way, bona fide, to settle in the West.

"I do appoint Felix Coste and Peter G. Camden executors of this, my last will and testament, and of any other will or executory devise that I may leave. All and any such document will be found to be olograph, all in my own handwriting.

"In testimony whereof, witness my hand and seal.

"(Witnesses' signatures)         Bryan Mullanphy (Seal)."

The court found and decreed that the heirs at law of Judge Mullanphy, who brought the suit or who were defendants or interveners therein, had no right, title or interest in the trust fund and dismissed their bill; that the city of St. Louis is the testamentary trustee in possession of and administering the trust fund; and stated its findings and directions further as follows:

"3. That the number of immigrants and travelers provided for by the will of said testator is not so large as in former years and has steadily and greatly diminished, but in the opinion of the Court it is not likely to cease altogether; that the total net income of the trust estate is no longer needed for the specific purpose designated by testator; that there are from time to time found within the limits of said City of St. Louis numbers of persons, including travelers, strangers and some immigrants who are helpless and without assistance, who need charitable aid and deserve it, persons who are traveling in various directions other than west, and persons who are traveling west who do not intend to settle there, who become stranded in the City of St. Louis and are in need of charitable aid and assistance. And the Court doth order and decree that the surplus income, beyond what may be necessary to properly provide for the persons designated by said testator, shall be used for the purpose of furnishing relief to poor immigrants and travelers generally in the City of St. Louis in need and distress, and found to be worthy of assistance; preference at all times to be given to immigrants and travelers coming within the designation of the will, as aforesaid.

"4. That the said City of St. Louis, as trustee, and the Board of Commissioners of the Bryan Mullanphy Emigrant and Travelers' Relief Fund be, and hereby are, authorized to co-operate with the various travelers' aid societies existing throughout the United States, and with the National Association of Travelers' Aid Societies, in furnishing relief and assistance to all poor immigrants and travelers who are found worthy of assistance within the City of St. Louis and its environs.

"5. That whenever due authority shall have been given by ordinance by the Board of Aldermen and the Mayor of the City of St.

Louis, then said City of St. Louis, as trustee, and the said Board of Commissioners shall have the power to erect a building for the administration of the relief and assistance aforesaid, at which building the general headquarters of the said Board of Commissioners may be maintained, and at which building food and lodging may be furnished and hospital beds may be supplied, and medical care and attention given, to all poor immigrants and travelers.''

The court further required annual reports and taxed the costs against plaintiffs. This will has been before this court on five previous occasions. [Chambers v. St. Louis, 29 Mo. 543; St. Louis v. Wenneker, 145 Mo. 230, 47 S. W. 105; St. Louis v. Crow, Atty-Genl., 171 Mo. 272, 71 S. W. 132; St. Louis v. McAllister, Atty.-Genl., 281 Mo. 26, 218 S. W. 312, and St. Louis v. McAllister, Atty.-Genl., 302 Mo. 152, 257 S. W. 425.] This will has attracted attention all over this country because of historical interest in the circumstances of its execution and because of striking changes, in the conditions it was intended to alleviate, so soon after the death of the testator. The evidence in this case is in fact the epic story of the expansion, settlement and development of the vast wilderness, acquired by the thirteen sparsely settled original colonies, into our great nation of today, with more than a hundred and twenty million people living between the Atlantic and the Pacific. This evidence included, in addition to the personal recollections of old residents of St. Louis, the following historical works: '' 'St. Louis, the Fourth City, 1764-1909,' by Walter D. Stevens; 'History of the Development of Missouri, and Particularly of St. Louis,' edited by Marshall S. Snow; 'A History of Missouri,' by Eugene Morrow Violette; 'The Chronicles of America,' Volume 25, entitled 'The Forty-Niners,' and Volume 26, entitled 'The Passing of the Frontier.' Encyclopedia Britannica, Volume 22, title, 'United States of America,' Volume 15, title 'Migration,' Volume 16, title, 'Oregon,' Volume 4, title, 'California,' Volume 16, title, 'New Mexico.' ''

Judge Mullanphy's will was made during stirring times, at the beginning of the greatest era of this country's expansion. During the early forties, St. Louis was a frontier post. Missouri was the western edge of civilization. The rest of the Louisiana Purchase territory, to the west and northwest, was the home of the Indian and the buffalo. During those years, this great expanse of vacant western territory was greatly increased by the addition of new lands and the frontiers of our country were pushed beyond the Rocky Mountains to the Pacific Ocean. Texas was annexed in 1845. Oregon was added by the boundary settlement with England in 1846. People began to move into these new lands. Then came the Mexican War and its termination brought to us the Southwest and California. Early in 1848 gold was discovered and that fall the whole world knew of it.

At the time Judge Mullanphy made his will, the surge of one hundred thousand Forty-Niners to the California gold fields was at its height. The unsuccessful European revolutions of 1848 had banished many peoples from their native lands, who were also seeking new homes. There were no railroads reaching the Mississippi but steamboats came up the river from New Orleans with people from the Atlantic states and from Europe. Others came from the East by way of the Ohio. St. Louis was the outfitting point for those who went overland by the Oregon and Santa Fe trails, which were then the only practicable routes. There was testimony that in June, 1849, two months before this will was made, there were great numbers of adventurers, immigrants, travelers and settlers stranded in St. Louis; that many of them arrived suffering from debility, weakness and disease; that many of them did not have sufficient funds to outfit themselves for their journey west and became public charges on the town; that a serious epidemic of cholera broke out; that 340 immigrants arrived in one day on a single boat during this epidemic; that lack of finances, illness, disease, as well as in some cases the wild and untamed ways of these people became a public problem of extreme importance; and that there was much discussion about the question at the time. It was with these matters in mind that Judge Mullanphy made this will and the importance of this problem to him is disclosed by the fact that a provision for aid in its solution was the only thing he mentioned.

Many things Judge Mullanphy could not have foreseen occurred to change the situation. The question of the right of the city to receive the property as trustee was not settled in the courts until 1860. Then the Civil War halted the tide of immigration through St. Louis. Soon after that war, the building of the Union Pacific Railroad and other later ones added new routes. St. Louis was no longer the bottle neck through which all westward travel passed. Immigration from Europe, however, continued to bring many people through St. Louis for whose aid the fund could be used. For a few years prior to the World War, they were arriving in this country at the rate of one million a year. When the World War stopped this movement, this court was asked in the McAllister case to terminate the trust but it refused to do so and commented that since that war had ended a new tide of immigration might commence. However, the adoption of a new immigration policy by Congress in the passage of alien quota immigration laws has prevented the fulfillment of that prediction.

Judge Mullanphy was a bachelor. His nearest relatives were several sisters, whose descendants are the Mullanphy heirs involved in this suit. Appellants say that "the donor was a man of wealth and means, a prominent citizen of St. Louis; a lawyer and at one time

a Judge.'' When he died, in June, 1851, his estate consisted of money and lands, most of which lay outside the city in St. Louis County. The city of St. Louis accepted this trust by an ordinance approved in November, 1851. Thereafter, the real estate was partitioned and the one-third going to the city under the will set off by metes and bounds. The validity of the trust was upheld by this court in the Chambers case, decided in 1860. The trust property was valued in 1860 at about one-half million dollars and is now shown to amount to about one million. It has produced a gross income of more than one million dollars in the fifteen years preceding the trial of this case. Much of this gross income was required for the upkeep of the real estate. About one-fourth has been spent for direct relief to individuals, a considerable part of which was for employees who sought out travelers in need or gave them information or other assistance.

The evidence shows the following activities of the trustee:

''From 1920 to the date of the trial the trustees kept records of the applications made to them for assistance; that these records showed that all sorts of persons, both as to sex, age and nationality, were assisted, either financially or in some other way. . . .

''Since 1920 the policy of the Board had been changed and become more liberalized to the extent that they determined to help all persons in need of aid or assistance, regardless of the direction from whence they came or where they were going, and this accounted in a large measure for the increase in the number of reported cases.

- . . .

''It has been the policy of the board of late that every dependent person in the city three days and less, that we take over the responsibility of that individual or family. . . .

''As a matter of fact, every conceivable ailment or desire that was human in nature was considered a cause for assistance by the board, and within the terms of the Mullanphy will. . . .

''The Mullanphy trust fund was, during the past ten years, affiliated with the National Travelers Aid Society, . . . formed for the purpose of aiding, helping and advising travelers throughout the United States, and this without regard to the purposes for which they were traveling, or financial needs. . . .

''There is a director of traveler's aid work, in the Union Station; . . . there were six station workers under her, two on each watch of eight hours; that she was instructed to organize the work of relief along the lines of helping anyone in transit who was destitute and in need of assistance; that there was no specific class of travelers to be aided and they were going in all directions and coming from all directions, and investigated all the requests, no matter what might

be their nature—anybody who was in distress from any cause, whether sickness of body or mind, or otherwise. . . .

"The work of the Station Aid particularly is to meet the incoming trains and to patrol the station night and day and to specialize in helping, finding and helping young people, unsophisticated people who may need direction, to safeguard the interest of children traveling alone; and we assist immigrants in language difficulties, or any trouble that they may have. We look out for the aged, also mental cases; and, with regard to immigrants, we try to make community connections for immigrants that stop here or will stop elsewhere; and community connections means we find their friends; we sometimes give them a little material assistance and try to connect them with community agencies that will help them find employment, and that will open up to them the educational and recreational facilities and help them to become good citizens. That is one great big part of the work. . . .

"Frequently, in a domestic way, we often help place immigrant girls who want places, because people come to us and ask us to find domestic help. Then we connect these immigrants who have language difficulties; if they are going to stop here in the city we consult the International Institute. They have clubs for girls; they do protective work. We make a follow-up visit; we send some of the men to Mr. Harry TerBraak; and if we find any society that we feel can help that individual better than another society we connect the immigrant or the traveler up, so the association can advise according to their needs."

The questions in this case are whether the purposes of this trust have wholly or substantially failed and whether the doctrine of *cy pres* can be applied to this case in the manner directed by the circuit court's decree. Appellants say:

"The provision of the will was a charitable gift having in mind but one, limited, specific and definite purpose, namely, to help 'settlers' in the West; that there was no longer any such class; that it had ceased to exist; that the purposes of the trust had become impossible of fulfillment, and that there was accordingly a reverter by operation of law to the heirs of Bryan Mullanphy. . . .

"The key words are '*bona fide to settle*' in the West. . . . 'Settlers' were the class that Judge Mullanphy wanted to help.

"Judge Mullanphy was not interested in men who were going out West to set up blacksmith shops, or mine for gold and silver, or run a grocery business, or to enter the practice of law or medicine, albeit they were travelers. He was not interested in travelers as such or immigrants as such. He was only interested in immigrants and travelers who were going to 'settle' in the West. He was interested in '*settlers*.' "

■ We think appellants' construction of the will. is too narrow both as to the meaning of the words "settle" and "settler," and as to the whole intent of the testator. It is well to remember the doctrine that "the letter killeth, but the spirit giveth life." [II Cor. 3:6.] We do not subscribe to the statement that blacksmiths, miners, grocers, doctors, or even lawyers are not sufficiently necessary to the building of new communities that they should not be classed as settlers. We do not think that the primary intent of Judge Mullanphy was to build up the West by aiding in its settlement. We think, rather, that it was to alleviate a local condition in his home city of St. Louis, which grew out of the mass movement of a great population into the new western lands. We think that in determining his intent we must look to the problem he sought to solve, the character of distress he wanted to relieve, and kind of conditions he desired to improve, rather than the immediate cause of such problem, distress, or conditions. So considering it, is it not apparent that this problem and the distress and the conditions created thereby. were those arising from travel undertaken by poor people, unfortunate people, and ambitious people, but nevertheless people who were traveling for proper purposes with the laudable motive of attempting to better their condition in life by their own efforts? It is, of course, true that the movement of population at that time was from east to west. It is also true that there was little reason for any "poor traveler" to make the long, arduous, expensive journey that was in 1849 required to reach St. Louis unless they were coming to settle in the West, except the gamblers, swindlers, thieves and courtesans who are always camp followers of such a march of population. But they were not traveling for bona fide purposes and were therefore· left to be handled by the authorities by other means than the bounty of Judge Mullanphy. We do not, therefore, believe that the direction of the travel was the important thing in the mind of Judge Mullanphy. Its direction was a matter of historical accident, due to the fact that the white race settled this continent from Europe and moved to the West, rather than from Asia by an eastward movement as is supposed to have been the case of a still earlier movement of another race into North America. Suppose a man who had taken up a homestead in the West was on his way east to bring back other members of his family or to obtain supplies or equipment, and came to St. Louis without funds, would he not be within the literal terms of the will?

But can we even say that the settlement of the West is completed? With every succeeding decade down to the most recent, the national census has shown that the geographical center of our population has moved farther to the west. It still remains east of St. Louis. Even though new policies have greatly restricted the number

of immigrants coming here from foreign countries, how can we say that the purposes of the trust have failed, even if we construe it strictly to the letter? As long as the center of population continues to move westward, there must be travelers from the East coming bona fide to settle in the West. Some of them will surely always come through St. Louis, located as it is on national automobile highways, and important rail and water routes. While the Santa Fe and the Oregon trails may be paved with concrete and poor travelers' may be outfitted in "Model T Fords" rather than "Prairie Schooners," there still must be poor travelers who need assistance. "For ye have the poor with you always" (St. Mark 14:7), likewise with poor travelers until human society reaches perfection. Even if our center of population should become almost stationary, as long as this remains a free country, will there not be travelers leaving their places of abode in the East coming to settle in the West? We, therefore, hold that the evidence does not show that the purposes of the trust have failed, and approve that part of paragraph 3 of the decree, of the circuit court, so holding and directing the application of the income of the trust property to be first used for such purposes. [See American Colonization Society v. Soulsby (Md.), 99 Atl. 944, L. R. A. 1917C, 937.]

We also approve the remainder of paragraph 3 of the decree and likewise paragraph 4 directing the application of the remainder of the income to the relief and assistance of other poor immigrants and travelers in need who are worthy of aid, and to cooperate with travelers aid societies for that purpose. We hold that this is a proper case for the application of the *cy pres* doctrine. We have already stated our views concerning the primary intent of the testator. *Cy pres* is a rule of equity; literally it means "as near to." [17 C. J. 695.] The reason for the rule is to permit the main purpose of the donor of a charitable trust to be carried out as nearly as possible where it cannot be done to the letter. As in the case of most other equitable rules, "no general rule can be enunciated as to the manner in which the *cy pres* doctrine will be applied, but each case must necessarily depend upon its own peculiar circumstances." [11 C. J. 360-363, sec. 77.] One limitation of the rule is that the purpose of the gift cannot be changed. For example, "if property is devised to education, it cannot be judicially diverted to religion, or the relief of the poor or the sick, or to general charity," or *vice versa.*' [5 R. C. L. 369, sec. 112; 11 C. J. 362, sec. 77.] Likewise, if a gift is to a particular institution, a court cannot authorize its application to an institution of an essentially different character, because to do so might allow it to be applied to an object for which the testator did not intend that it should be used. This limitation does not, however, prevent the substitution by the court of another object of the same

general charitable nature where the original object fails. [5 R. C. L. 368.]

This is particularly true where there is merely a surplus to be disposed of, as in the case here; the original object not having failed but not requiring all the available income. In such a case the surplus "will be applied to the same or like charitable objects." [11 C. J. 363, sec. 78, and cases cited.] There is also a marked difference in the application of the doctrine when the object of a charitable gift fails, by becoming impossible to carry out as directed, before it takes effect, as, for example, a failure before the death of the testator, rather than when it fails after the title to the property has once vested absolutely in trustees for charitable purposes and has thereafter been long used by them for such purposes. The rule in the latter case is that, "where there is no reservation of a power of revocation or provision for reverter, the trust may be extinguished so as to revert to the donor or his heirs when, and only when, there has been an entire failure of object or purpose, there being no reverter when the gift can be applied to a similar charity, under the doctrine of *cy pres.*" [11 C. J. 372, sec. 100.]

In England, there was a prerogative power of the King over charitable trusts, which has never been recognized in this country, and which was separate and apart from the jurisdiction of courts of equity. The rule, as we apply it, is the exercise of a judicial power only. It is said in 2 Perry on Trusts (7 Ed.) 1231-32, sec. 723: "*Cy pres*, as applied to judicial acts, is a rule of construction and not of administration. . . . If the construction shows that the fund was to be employed in the way pointed out forever, and in no other way, then all *cy pres* construction must fail. . . . If the construction of a written instrument bears out the assertion that the donor had no intention, in case of the failure of his first purpose, the charity must fail on the failure of objects to which to apply it. . . . [Sec. 724, pp. 1233-34.] [4] There can be no dispute as to the duty of the court to construe written instruments in order to ascertain the intention of the parties thereto, and there can be no question that it is the duty of courts to carry such intention into effect as near as may be when it can be done consistently with the law of the land. If, therefore, the purposes of a charity named in a will fail, and there are no objects to which to apply the funds, the court must read the whole will in order to determine whether the charitable intention of the testator has come to an end, and the fund must revert to the heir or personal representative; or whether a probable intention can be gathered from the instrument, that, in the event which has happened, the donor intended that his gift should be applied *cy pres* the original purpose." Of course in construing a will for such purpose, the court will, as in every other construction of any written in-

strument, "consider the whole instrument in the light of all the circumstances, and conclude, from the will and all the facts, what was the probable intention of the testator." [Sec. 723, p. 1232.]

Many instances could be cited on the application of the *cy pres* doctrine to situations substantially similar to the one presented here. There is the case of a trust fund part of which was to be applied to the redemption of British slaves in Turkey and Barbary. When there ceased to be British slaves to redeem, the court directed the income to be applied to other charities as nearly like the original purpose as possible. [Attorney-General v. Iron Mongers' Co., 2 Beav. 313; 1 Cr. & Phil. 208, 10 C. & Fin. 908.] There is the case of a fund given for a school for the education of the poor in a certain district. When the district was taken by eminent domain, the court directed the funds to be applied *cy pres* the original purpose. [Attorney General v. Glyn, 12 Sim. 84.] There is the case where a hospital was established for lepers. When leprosy had become almost extinct in England, the court approved the application of the revenues of the fund to a general infirmary with preference to all lepers who might offer themselves. [Attorney-General v. Hicks, Sc. 3 Bro. C. C. 166.] There is the case of a fund established for a hospital and burial place for persons sick of the plague. The court applied the *cy pres* rule, although the plague had not appeared in England for more than 180 years. [21 Beav. 392.] There is the case of a fund to create possible sentiment that would put an end to negro slavery and for the benefit of fugitive slaves. After slavery was abolished by the Thirteenth Amendment of the Constitution, the court directed the application of the fund to the education and interest of negro freedmen (late slaves). [Jackson v. Phillips (Mass.), 14 Allen, 539.] There is the more recent case of a fund, collected during the World War, to provide comfort, aid and assistance to the men in the military and naval services of this country and to aid in their mental, moral and physical welfare. The fund was not all used before the war ended. The court held the *cy pres* rule applicable and directed the fund to be used for the assistance of veterans of the war and dependent members of their families. [Peter E. Leddy Post No. 19 of American Legion v. Roberts (N. J.), 129 Atl. 148; for a review of many cases discussing the application and limitations of the *cy pres* doctrine, see 74 A. L. R. 671; 5 R. C. L. 364, 370, secs. 104, 113; 11 C. J. 358, 382, secs. 74-100; 2 Perry on Trusts, pp. 1221-1246, secs. 717-730; Catron v. Scarritt Collegiate Institute, 264 Mo. 713, 175 S. W. 571; Lackland v. Walker, 151 Mo. 210, 52 S. W. 414; Women's Christian Assn. v. Campbell, 147 Mo. 103, 48 S. W. 960; Mo. Historical Society v. Academy of Science, 94 Mo. 459, 8 S. W. 346; Goode v. McPherson, 51 Mo. 126, 127.]

The limitation of the doctrine upon which appellants build most of their argument is that "the court will not apply the *cy pres*

rule where 'the charitable purpose is limited to a particular object or to a particular institution and there is no general charitable intent.' '' Their argument is to the effect that Judge Mullanphy's particular object was to get the West settled; that the West became settled when the public domain was substantially all transferred to private ownership; and that there can be no more settlers coming to St. Louis for that purpose. We have already commented upon this contention. Our conclusion is that Judge Mullanphy's primary intent was to prevent conditions in the city of St. Louis which would arise from a congregation of poor immigrants or travelers stranded in the city, without funds, suffering from sickness, disease or other distress, and was to protect the people of St. Louis from both the physical and financial ills which would result if such a situation were permitted to exist. In short, his gift was primarily in aid of the city of St. Louis and its people, rather than in aid of the settlement of the West. A secondary motive and a natural result would, of course, be the merciful relief of the distress and sufferings of the individuals who were the poor travelers and immigrants. However, both of these objects can still be effected by the *cy pres* application of the surplus, directed in paragraphs 3 and 4 of the circuit court's decree.

■ What is meant by general charitable intent? Undoubtedly, it is the opposite of an intent limited to the accomplishment of a particular objective which can be accomplished within a more or less definite period of time. That is, it is an intent that a gift be continued within the limits of its general purpose and that shall not cease when a particular thing is accomplished. Unquestionably, when the intent is to apply the gift to a continuing problem, there is a general charitable intent. Poverty, sickness and distress are certainly continuing problems. Neither the particular direction of the movement of travel nor the particular objective of the travelers, which created the problem in Judge Mullanphy's time meant that travel in other directions would not continue the problem. We think that we can reasonably say that it was his probable intent that he desired the fund to be used as long as the problem of travel might create conditions in the city of St. Louis which would require aid. The idea that he meant it to be permanently applied to this problem is strengthened by the fact that his will shows no intention that it should ever revert to his heirs; and that under his will the remaining two-thirds went by the intestacy laws to his heirs and that he did not restrict the use of the fund to only its income. Since he did not specifically provide that only the income from the fund should be used for the objects stated, perhaps the problem looked so great to him that he thought even the whole of his substantial gift would soon be consumed in the work he directed. If so, that certainly does

not show any intent that any part of it should ever be returned to his heirs, but rather the contrary. However, we think that present circumstances make proper the use of the income of the fund only. We, therefore, approve the application of the income from the fund directed by paragraphs 3 and 4 of the circuit court's decree.

We cannot, however, approve of paragraph 5 of the circuit court's decree that the funds be used to erect a building for the administration of the relief. We do not think that is within the probable intent of Judge Mullanphy. We think that he intended the whole of the income the fund could produce to be applied to the relief and assistance of poor immigrants and travelers coming to St. Louis for bona fide purposes. Surely the city of St. Louis with its fine public buildings can find space for offices for the administration of the fund. Surely there is room in its great hospitals for those who may need medical treatment. It would seem that the use of a substantial portion of the fund for duplicating other buildings would jeopardize rather than further the objects intended, and that the purpose of the gift can be best carried out by workers who seek out and investigate proper cases for its use. As shown by the evidence quoted above, it is contemplated that the service at the Union Station be extended to bus depots. The need for it will no doubt arise in tourist camps and perhaps even in airports. Worthy objects of the fund might be expected to be less liable to voluntarily seek for the relief than unworthy ones.

Appellants also say that, even if the trust should not be terminated, the court should not have adjudged costs against them and should have sustained their motion for allowance of costs and expenses of litigation including attorneys' fees to be paid out of the trust fund. The court, in overruling this motion, stated: "They (plaintiffs) instigated the litigation. Such litigation is opposed to the purposes of the trust and is not simply a question of construction of some ambiguity in the trust."

Appellants rely upon the McAllister case which was brought by the city. This court held that in the McAllister case the court did not exercise sound judicial discretion in refusing to make an allowance under the circumstances of that case, saying:

"Appellants did not begin or invite the litigation. After they became parties by intervention they did nothing, so far as the record discloses, to hinder, delay or obstruct the speedy and orderly disposition of the cause. On the contrary they made it possible for the court to determine and set at rest all questions with respect to the further uses of the fund, an indispensable requisite for its proper administration, in the event it was found that the objects for which the charity was originally created had failed."

In the present case the trustee did not commence the litigation. It was begun by appellants not for the purpose of construction of the trust instrument but for the purpose of destruction of the trust estate. The rule in such matters has recently been stated by the court en banc in Trautz v. Lemp, 334 Mo. 1085, 1. c. 1094, 72 S. W. (2d) 104, as follows:

"Where an instrument that creates a trust estate is so ambiguous that two or more persons may fairly make an adverse claim to the fund, either may resort to a court of equity for correct interpretation, and the court is justified in not only assessing the cost of the litigation against the estate, but also in allowing reasonable attorneys' fees payable out of the trust estate both to the defeated and successful parties. (Citing authorities.) But this rule does not apply where the bill is not filed merely for the purpose of obtaining a construction of the instrument creating the trust and the direction of the court, but to enable the litigant to obtain something as an heir. (Citing authorities.) Under these circumstances the costs including the attorneys' fees should not be allowed, even if the litigation incidentally settled the status of the trust estate, that not being the purpose of the litigation. . . .

"In what way would the trust estate have been benefited? The only answer we can see to this question is that the trust estate would not have received any benefit, in fact, the trust estate would have been destroyed. 'There is no equity in requiring the trust fund to remunerate those whose sole claim to consideration is the fact that they sought to destroy that fund.' " [See, also, Chapman v. Chapman, 336 Mo. —, 77 S. W. (2d) 87.]

It is true that the city and the Attorney-General filed cross-bills under which they obtained directions for the future administration of the trust estate, but that was not appellants purpose in commencing the litigation nor what they sought on this appeal. We do not see that giving such instructions added materially to appellants' attorneys' fees or to the costs. We hold that the trial court did not abuse its discretion in refusing the allowance on these grounds.

It is ordered that the decree of the trial court be modified by striking therefrom paragraph 5. The decree is otherwise affirmed. *Ferguson* and *Sturgis*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.