The judgment should be reversed and the cause remanded. It is so ordered.

WESTHUES and BARRETT, CC., concur.

PER CURIAM.

The foregoing opinion by BOHLING, C., is adopted as the opinion of the court.

All concur.

CREEK et al.

v.

UNION NAT. BANK IN KANSAS CITY et al.

No. 43239.

Supreme Court of Missouri.
Division No. 2.

Feb. 8, 1954.

Motions for Rehearing or Transfer
to Court en Banc Denied
April 12, 1954.

J. M. Loomis, Omar Robinson, Hall De-Weese, Kansas City, for appellants Hortense A. Bloch and others.

Daniel S. Millman, Daniel L. Brenner, Kansas City, for appellants Helen B. Goldsmith and others.

Brenner, Van Valkenburgh & Wimmell, of counsel, for appellants.

Richard S. Righter, J. W. R. Headley, Kansas City, Lathrop, Woodson, Righter,

Blackwell & Parker, Kansas City, of counsel, for plaintiffs-respondents.

H. M. Langworthy, Clyde J. Linde, R. B. Langworthy, Billy S. Sparks, Kansas City, Langworthy, Matz & Linde, Kansas City, of counsel, for respondent Union Nat. Bank in Kansas City, successor trustee.

Howard A. Crawford, Kansas City, for defendants-respondents John H. Lathrop, executor of the estate of Cyrus Crane, deceased, Carrye Henrietta Hart and Theodore S. Cady.

BOHLING, Commissioner.

Robert V. Creek and Douglas W. Creek sued the Union National Bank in Kansas City, the trustee, and the other beneficiaries (hereinafter designated "other defendants") in equity to decree the termination (except as to provisions for certain charitable institutions) of a trust agreement and amendments executed by Helena Reicher, Helena Reicher, trustee for Rosa Reicher, and Rosa Reicher, under which the beneficiaries receive a trust estate of approximately $330,000 to the exclusion of trustors' heirs at law, and for distribution. The trustee, having been notified that the heirs at law claimed the trust estate, had refused to make distribution.

The other defendants took the same position as the plaintiffs. The heirs at law were brought in under appropriate proceedings by the trustee, and the trustee by its pleadings sought, briefly stated, a decree that the trust agreement and amendments were valid and the approval of the administration of the trust.

The trustors' heirs at law (second and further removed cousins of trustors, with the exception of a first cousin, and herein designated claimants) attacked the trust agreement and amendments mainly on the grounds of alleged mental incompetency of and alleged undue influence exercised upon the trustors by the grandmother, Mrs. Cora Bower, and the mother, Mrs. Helen Creek, of the plaintiffs. They also claim an interest in some of the trust assets under testamentary trusts in the will of the father and in the will of the brother of the trustors. Claimants state voluminous pleadings gave the court full jurisdiction.

The decree, final so far as here involved, sustained the trust agreement and amendments and its administration. Claimants have appealed.

The record, replete with a detail of facts, is lengthy, as are the briefs. The testimony is frequently partisan, contains statements later disclosed as hearsay or conclusions, and irreconcilable. We shall endeavor to give the facts essential to a determination.

Mr. and Mrs. Morris Reicher had three children—Solomon (known in the record as Sol), Rosa and Helena. None of the children ever married. They were natives of Poland, resided for a time in Leavenworth, Kansas, and lived at 1317 Cherry Street, Kansas City, in the 1890s, and 3219 Campbell Street in the early 1900s. Morris Reicher operated a wholesale drygoods business. He made Sol a full partner. The business was known as "M. Reicher & Son." Mrs. Reicher predeceased her husband. Morris Reicher died January 15, 1913. Solomon Reicher continued the business. He died September 29, 1927. Rosa and Helena had an apartment in the St. Regis Hotel from 1931 until 1939. They then lived at 7236 Jarboe, and about a year later purchased a home at 601 West 57th Street Terrace.

Mrs. Cora Bower, who had nursed Morris Reicher, continued in the employ of the Reicher family for twenty-seven years as housekeeper and companion until her death, due to cancer, about November, 1940.

Mrs. Creek followed her mother, Mrs. Bower, as housekeeper and companion under the directions of the sisters. She died suddenly March 1, 1942. Mrs. Grace R. Buck followed Mrs. Creek.

Helena Reicher, who was a few years younger than Rosa, died November 11, 1941, the result of burns sustained when her gown caught fire from a gas heater. Mrs. Creek was severely burned at the time.

Rosa Reicher, about 85 or 86, died November 11; 1950.

The original trust agreement was executed December 7, 1927, and signed: "Helena L. Reicher; Helena L. Reicher, Trustee for Rosa Reicher; Rosa Reicher, Trustors. New England National Bank and Trust Company in Kansas City by Thad B. Landon, Vice president and Trust Officer, Trustee." It provided, among other things, for the payment of the income to the trustors or the surviving trustor, and, upon the death of the survivor, for the distribution of the trust estate to named employees of M. Reicher & Son, plaintiffs and named charitable institutions. The trustors or the surviving trustor could "modify, alter, terminate or revoke" (herein referred to as amendments) the trust agreement in whole or in part.

The New England National Bank and Trust Company (herein referred to as the New England Bank) merged with the Fidelity National Bank and Trust Company of Kansas City (referred to as the Fidelity Bank) January 1, 1929. The Fidelity Bank went into liquidation in 1933. The Union National Bank in Kansas City (referred to as the Union Bank) was organized in July, 1933.

A. R. Strother was trust officer for the Fidelity Bank. R. B. Hewitt became vice-president and assistant trust officer of the Fidelity Bank in 1929, succeeded Mr. Strother in about two years, became vice-president and trust officer and in 1951 president of the Union Bank. William E. Estes, an assistant trust officer of the New England, Fidelity and Union banks, administered the Reicher trust until he resigned in 1935 or 1936; and Whitney Ogden, with the trust departments of the Fidelity and the Union banks since 1922, administered it thereafter under Mr. Hewitt.

The trustors' first amendment of the trust agreement appointed the Union Bank as successor trustee on December 22, 1933.

Soon after Sol's death, F. W. Everest, and perhaps Matt McCormack (who died in 1929), employees, managed M. Reicher & Son, with the advice of Alfred Hart, a cotton goods broker and a close friend and business advisor of the Reicher family prior and subsequent to Sol's death. Helena Reicher and Rosa Reicher contracted on April 13, 1929, with F. W. Everest, C. W. Smith, O. P. Berger, John McCormack (employees named as beneficiaries in the original trust agreement), John F. Chappell, Morris Katz, R. E. Coleman, and other employees of M. Reicher & Son to transfer all assets, except cash, to a corporation to be known as M. Reicher & Son, Incorporated, with a capital of $120,000, represented by 1,200 shares of stock. The sisters agreed to and gave between 17½ and 5 shares of the stock to individual employees in recognition of services rendered, and agreed to permit any employee to purchase up to 50 shares of said stock and give a 4-year note therefor. M. Reicher & Son, Inc., was incorporated May 7, 1929. Mr. Everest was president, Mr. Chappell was vice-president, and Mr. Smith was secretary-treasurer. The corporation lost money, and Helena, who had been connected with the business, complained that the store was being badly managed. In April, 1940, Mrs. Creek telephoned Morris Katz about finding a buyer for the stock. Mr. Katz went to the home, talked with Mrs. Creek and Mrs. Bower in the presence of Helena and Rosa, and, according to Mr. Katz, after Mrs. Creek sent the sisters upstairs, told them he could "get $25,000 for it"; and Mrs. Creek and Mrs. Bower stated they would see.

Hyman and Jake Denowitz (Katz had talked to Hyman before seeing the sisters) purchased M. Reicher & Son in May, 1940. Mr. Smith testified the sisters gave the employees a week to meet the offer but Mr. Katz denied this. The purchasers soon liquidated the business for more than $43,000, realizing a net profit of $18,000 on which the Denowitzes "cut in" Mr. Katz for $6,000.

By an amendment of May 28, 1940, the trustors provided for, after the death of both trustors, three charitable trusts of $20,000 each; and for the distribution of the remaining assets to Robert V. Creek, Douglas W. Creek and Helen Creek in

equal shares, or their children per stirpes. Other provisions of this amendment will be mentioned later.

By an amendment of November 19, 1941, Rosa Reicher, the surviving trustor, provided, so far as material, for the distribution of the trust assets upon her death, first, $200,000 to Robert V. Creek, Douglas W. Creek and Helen Creek, share and share alike, or the survivor or survivors of them; next, $10,000 to Cyrus Crane or, if deceased, his children; next, $5,000 to Alfred Hart or, if deceased, his children; next, $2,000 to Theodore S. Cady; next, $10,000 (to be held and administered in two equal trusts) for The Children's Mercy Hospital and the Mosahav Zkeinim Home for Aged Jews (Appleman Home for Aged Jews); and the residue, if any, to Robert V. Creek, Douglas W. Creek and Helen Creek, as aforesaid. (There was testimony that the trustors had discussed the changes prior to the death of Helena.) This amendment recited that Mr. Crane was named in appreciation of his long friendship and as legal advisor to Sol and the trustors; that Mr. Hart was named in appreciation of his loyal services to Sol, to M. Reicher & Son and to the trustors, and that Mr. Cady was named in appreciation of his personal interests and services; and, as did the amendment of May 28, 1940, that the Creeks were named as beneficiaries "in grateful appreciation of the services of more than twenty-five years rendered to the Trustors" by their mother and grandmother and by them. Whitney Ogden witnessed this amendment.

Hortense Bloch, a claimant, testified that she was a second cousin of Sol, Helena and Rosa. She first met them in 1919. She testified that there was a great change in Helena about two years before Sol's death; that Helena would sit for hours, smile, never move and never enter into a conversation; that she was that way at times prior to Sol's death; that she thought Helena at times knew "what it was all about" and at times "she didn't know anything," and that Helena did not do good work at the store, but witness was not there.

Rosa, according to Mrs. Bloch, had a constant grin on her face; was always knotting a handkerchief and saying numbers, "75, 86, 65," never below 50. "You couldn't talk to Rosa Reicher." She had the mentality of a six-month child. Rosa was insane all the time witness knew her.

Mrs. Bloch never saw Helena or Rosa after July, 1928. This came about in this manner. There is substantial testimony that after Sol's death (September 29, 1927) Helena attempted to operate M. Reicher & Son, but soon realized she could not do so. This caused her to be worried, upset and nervous, and her physician sent her to Dr. Herman S. Major, a specialist. Dr. Major testified Helena was at the Major Sanitarium from November 26, 1927, to March 24, 1928, and from March 28 to November 28, 1928. Mrs. Bloch testified that a short time after Sol's death she and Laura Negbaur went to the Sanitarium upon learning Helena was there. They would not release Helena. Mrs. Bloch immediately consulted Sam B. Strother, a lawyer, and swore to insanity informations against Helena and Rosa (who was at home), stating each had property. The informations were dated July 23, 1928. Mrs. Bloch testified she could not understand about Rosa, stating she did not know "anything about any insanity proceedings," and insisted all she wanted to do was get Helena out; that Mr. Strother, Mr. Crane, her husband and she were at the Probate Court; that she returned to the Sanitarium, got Helena, and took her home; that Mrs. Bower answered the door and "dragged" and "threw," "practically threw" Helena into the house, and told witness to never come to the house again and she never did; that she did not know Helena and Rosa were examined by psychiatrists, who said each was sane. The two insanity proceedings were dismissed on October 4, 1928, by Mr. Strother.

Mrs. Bloch testified that she did not then know Helena and Rosa owned M. Reicher & Son and had created a large trust fund for themselves. The first inquiry into such matters followed Rosa Reicher's death.

We insert other evidence on the insanity proceedings. A letter from Cyrus Crane to Judge Thad B. Landon, trust officer of the New England Bank, was admitted as bearing upon claimants' charge the trustee had knowledge that Helena and Rosa Reicher were incompetent. Mr. Crane stated in the letter, dated October 12, 1928, that Mr. Sam Strother represented Mrs. Bloch, "and after an examination made by doctors whom he suggested, and receiving a report which was not favorable to his contention, the proceedings were dismissed."

Drs. G. W. Robinson, B. Landis Elliott, and Edward T. Gibson examined Helena at the Major Sanitarium on September 26, 1928. Dr. E. F. DeVilbiss examined Rosa. They were qualified specialists in nervous and mental diseases. Drs. Gibson and DeVilbiss died prior to the trial. The substance of the testimony of Drs. Robinson and Elliott was: Helena was in very good physical condition for her age. She was mentally competent. She had found the task of managing M. Reicher & Son too great for her, began worrying, and became discouraged and depressed. She was in good contact with her surroundings, her memory was good, she answered correctly, knew the reasons for her condition, was clear and logical, and had no hallucinations. Dr. Robinson described her condition as "anxiety neurosis, an anxious, depressed, nervous state, and a lack of confidence to carry on." Dr. Elliott described her condition as "a mild depressive state," (a mild manic-depressive state if manic-depressive at all), "a reactive depression, responsive to circumstances," "an emotional state of depression," commonly occurring from too many responsibilities in business life.

Morris Katz worked for M. Reicher & Son from 1908 until 1940, moving from stock boy to salesman, to stockholder and an interest in the purchase of the business. Omitting matters mentioned elsewhere, he stated: After Sol's death, Helena was upset and nervous at times. She paid him $260 when he should have received $150. When he returned the overpayment she remarked "it looks like I am losing my mind.". She came into the store "with a bunch of Liberty bonds" several weeks after Sol's death and Mr. Everest and Mr. McCormack took them. She never returned to the office. Between 1929 and 1940 he visited the Reicher sisters about three times. Mrs. Bower called him and he went out and talked about the business to Mrs. Bower and Helena. Rosa was in bed. Helena didn't say anything about the business, acted as if she did not care. He explained to Mrs. Bower. He asked Helena to pay the funeral expenses of Staz Gale, a first cousin of trustors, and she refused, but Mrs. Bower had Mr. Gale buried in the Reicher burial lot and paid the expenses with Helena's money. If Mr. Gale is so listed on claimants' genealogical trees in evidence, we have overlooked his name, and Mr. Katz did not explain how he knew the details. Mr. Katz testified that on one occasion prior to 1913, Rosa was on the second floor of the store and was taking off skirts and putting them on. Rosa was nervous, used her hands as if tying knots in a handkerchief, didn't talk much. He testified that Mrs. Bower "was the whole boss"; "had all authority over them"; "they did what she said." He narrated other facts, some of which he got from talk in the store. He called after Helena's funeral and Mrs. Creek told him Rosa was sick, "nervous and not in full mind." Rosa was not of sound mind. Helena was not of sound mind from shortly after Sol's death.

Roy A. Young was chauffeur and worked in the store from 1925 to 1938. He drove Helena, Rosa and Mrs. Bower, who was always with them, to shop at the stores and to attend to business at the bank. They went on pleasure drives; to Belton to visit the Creeks, to Leavenworth for the scenic views, and later to Lexington to visit the Creek boys. At the St. Regis Hotel Helena couldn't carry on a conversation, but sometimes "she would make sense." She got so she would stand and stare and not answer. He most frequently saw Rosa in the automobile. She would call off numbers, "10, 20, 60," was frequently nervous, would tie knots in her

handkerchief, had a blank look, wouldn't answer, but sometimes she spoke. He did not recall Rosa having an intelligent conversation with Helena. Mrs. Bower "seemed to tell them" everything to do or not do, like a mother. They were of unsound mind. At his instance Mrs. Bower told him she would see that he received some of M. Reicher & Son, Inc., stock; but he was not given any; and: "It made me so mad, * * * I wouldn't buy any."

Dr. Herman S. Major specialized in nervous and mental diseases. He was head of the Major Clinic. He used a copy from his records to refresh his memory. Rosa was in his sanitarium from September 11 until December 24, 1924. Solomon gave him a case history of Rosa having a high school education; having three prior nervous breakdowns, and that her illness was of six weeks duration. Rosa was a manic-depressive case, mixed type, sometimes depressed and other times excited. She was of unsound mind, and while at the sanitarium could not be considered absolutely competent and to know the details of everything in a business way. Pressed on cross-examination whether when interviewed by plaintiffs' counsel he had said he could not recall the Reicher sisters, he testified that it was difficult to recall a patient not seen for twenty-five years, but he remembered Rosa, remembered she was there. He considered Rosa in "very good condition" when she left and she would recover if she continued to improve.

Dr. Major testified that Helena was also a manic-depressive case, depressed by her responsibilities, purely emotional, temporary, a mild case, quiet and cooperative. She was of unsound mind. At times her mind was clear. When discharged she was apparently normal and competent. She was submissive and susceptible to influence. He never saw her after her discharge, November 28, 1928. A manic-depressive psychosis is almost always of a temporary nature, and the great majority recover under treatment.

Mrs. Martha C. Ohlhouse was resident manager of the St. Regis Hotel from 1930 to 1934. Mrs. Bower rented an apartment for the sisters in January, 1931, from her. Helena and Rosa were immaculate in their dress and appearance. Helena was an intelligent person. Mrs. Ohlhouse, after describing Rosa much as did Mr. Young, testified Rosa was mentally unsound. She stated Mrs. Bower always paid cash, but cancelled checks issued by Helena to Mrs. Ohlhouse established payments by check. Other statements are mentioned later.

Rabbi Samuel S. Mayerberg met Helena and Rosa in 1928. No feature of their personalities, other than their overall physical appearance, would cause him to recall them, and there was no change in the demeanor of either until after the death of Helena. They were fully aware when they attended worship. Their attendance fell off and he frequently visited them at the St. Regis. He considered Helena's mentality to be very slow and low. He never heard Rosa say numbers, or converse with anyone, but she did speak a few words, and responded with her eyes or a nod of the head. Rosa was "of very low mentality." She was grief-stricken by Helena's death and after 1946 was a complete invalid. He recalled Rosa signing a pledge card at 601 W. 57th St. Terrace and giving a negative response when he suggested a larger contribution. Church contributions were signed by Helena or Rosa up to 1945. He would not say that either was insane or unbalanced mentally.

Other witnesses for claimants testified, after stating their observations, that one or the other or both of the sisters were not of sound mind. Henry O. Freet, who managed the St. Regis Hotel for about a year and a half, resigning April, 1933, testified Rosa was unsound and Mrs. Bower made all arrangements pertaining to the apartment. Dr. Noah Adams, an eye, ear, nose and throat specialist of 50 years, treated Helena one to three times a week from November, 1936, to November, 1938, for chronic conjunctivitis, and testified Helena only responded with a shake of the head, and her pupils at times were dilated, indicating relaxed muscles and unsound mind. One witness testified that in 1899, when he was

about ten years old, he saw a nude woman, one of the Reicher sisters but he did not know which one, walking down the street. Robert E. Coleman, bookkeeper for M. Reicher & Son between 1921 and 1932, saw the sisters in 1930 or 1931 twice at the St. Regis Hotel, and was permitted to state each sister was unsound, there being no jury. Freddie Mae Adams, the cook for Rosa after May, 1944, testified that Rosa was unsound. She admitted on cross-examination that a signed statement she gave on May 10, 1951, recited, among other things, that Rosa talked to her very little but talked to and confided in Mrs. Buck; and that Rosa was mentally competent in 1944 and 1945.

George C. Moore, a vice-president of the New England Bank, testified that Helena, soon after Sol's death, came to his desk and he noticed she had some Government bonds (he did not know whether they were registered) in her hand. He told her she should not be carrying them around and took her to the president of the bank. He stated: "She acted perfectly normal."

Helen Goldsmith, a claimant and a second cousin, saw the sisters up to about 1925, and her husband saw them at times between 1920 and 1924. They described them much as did Mrs. Bloch and testified the sisters could be influenced by Sol and the housekeeper, were unsound in mind, and neither could engage in business.

Eva I. Look, widow of Dr. Henry H. Look, an eye, ear, nose and throat specialist, observed Helena when Sol brought her to the office as often as twice a week from 1921 on for an eye condition and Mrs. Bower brought her once or twice after Sol's death. She testified Mrs. Bower would tell Helena what to do, and Helena would obey like a child, and that Helena was not mentally capable and not able to engage in any kind of business from 1921 on.

On the other hand there was testimony from those who worked or had business at M. Reicher & Son, including claimants' witnesses Coleman, Katz and Young, that from 1908 until after Sol's death in 1927 Helena was in charge of the office at M.

Reicher & Son, instructing the help, computing the discounts etc.; that she was competent and efficient, and that she hired and fired the office help. After Helena realized she could not take care of the business of M. Reicher & Son she did not return to the store to stay or work.

We take up plaintiffs' evidence. Mr. and Mrs. Creek were married in 1920. Robert V. and Douglas W., plaintiffs, were born February 28, 1921, and June 6, 1923, respectively. Their testimony was to the following effect: They moved from Kansas City to a farm near Belton in 1924. Sol (up to his death), Helena and Rosa, with Mrs. Bower, visited them frequently on Saturdays, Sundays and holidays. Helena, at times, stayed for several days or a week, and carried on a normal conversation with Mrs. Creek. The Creeks came to Kansas City two or three times a month and visited the Reichers. The boys stayed with their grandparents Creek until Helena and Rosa had Mrs. Bower arrange for them to stay overnight on a number of occasions at the St. Regis.

Mr. Creek died in 1931. Mrs. Creek moved to Kansas City in 1934 and the families visited back and forth. Sometimes Helena stayed for two or three days to get away from the hotel, but Rosa did not stay overnight. Douglas recalled Helena working a high school mathematical problem for him in her head on one of her visits. The boys accompanied the sisters and Mrs. Bower on auto trips. On one occasion Rosa said she had decided not to go and then changed her mind and accompanied them. Both families had lived at Leavenworth, and on trips to Leavenworth the sisters and Mrs. Bower would talk about landmarks and people they recalled. Helena was the more talkative of the sisters and usually the spokesman. She talked freely to Mrs. Bower, Mrs. Creek and the boys, and when interested in a subject went into detail. Rosa did not talk a great deal, but listened, shook her head and occasionally commented. If Helena made a misstatement or Rosa disagreed, Rosa spoke up and what she said was usually carried out. Rosa talked to the boys after she got used to them.

Among other things, Helena and Rosa discussed a trip to Europe with Sol. Helena explained her father had come to America to avoid serving in the army; stated they had no near living relatives, only distant cousins; expressed herself as hostile to the Blochs and Negbaurs, and for the boys not to admit them to the home.

Robert (1937–1940) and Douglas (1938–1942) attended Wentworth Military Academy at Lexington.

The sisters and Mrs. Bower were becoming aged and while they lived at 7236 Jarboe they had Mrs. Creek move in with them to assist Mrs. Bower, who was an invalid prior to her death. About 1940 the sisters purchased the home at 601 West 57th St. Terrace. Mrs. Creek was to contribute her furniture and complete the furnishing of the home out of $600 a month allowed for her services, the expenses of the home, a cook, a man about the yard, and other items. Neither Mrs. Bower nor Mrs. Creek left an estate. Helena paid Mrs. Bower's funeral expenses—$243.55. Rosa, at Robert's request, paid Mrs. Creek's funeral expenses, $538.62, by check dated March 9, 1942. The additional furniture purchased by Mrs. Creek had not been paid for. Robert, in obtaining an order refusing administration on Mrs. Creek's estate, stated in an affidavit that her household furniture was of the value of $25. He asked Rosa if she wanted Mrs. Creek's furniture and Rosa agreed to purchase it, with the exception of a desk and piano which were to remain in the home as long as she lived, and gave her check, dated April 1, 1942, for $1,000 therefor.

Robert was to have been married the day his mother died (March 1, 1942) and married soon after. Douglas married October 11, 1942. Rosa gave each a wedding present of $500. The gifts were Rosa's idea. These gifts and the $1,000 for the furniture were applied on Mrs. Creek's obligations for the furniture and a debt to Wentworth Military Academy.

With Rosa's consent, Robert and later Douglas, with the help of their wives, undertook to take Mrs. Creek's place. Mrs. Grace Buck was employed as a nurse April 1, 1942. Robert left for the Armed Services May 30, 1942, but his wife remained. Douglas was in the Service three months before receiving any pay. He asked Rosa for a loan of $500 but she refused him. About the time he left, December, 1942, he arranged for Bud Eldridge, a sailor, to stay at the home at nights, but Rosa refused to permit this because she did not know Mr. Eldridge. Mrs. Buck took over as housekeeper January 1, 1943.

Robert and Douglas testified that each sister was rational and sane.

Dr. John G. Sheldon treated the Reicher family from 1912 until 1939, twenty-seven years. He testified the sisters had been reared in Europe and taught to obey. He arranged for Rosa to see Dr. Major in 1924, because she was nervous and could not sleep. She could answer any question intelligently, knew what she wanted to do, and her mental faculties were not deranged. She discussed investments intelligently with him. He considered both sisters, especially Rosa, "rather keen" on money matters. After Sol's death Helena worried about the business, became upset and nervous, and he sent her to Dr. Major. She answered questions intelligently and reasoned. Helena and Rosa were sane while he knew them.

Dr. P. G. Quistgard, a physician and surgeon and Chief of Staff at St. Joseph Hospital in Kansas City, attended Helena, Rosa, Mrs. Bower and Mrs. Creek from 1939 on. He had an extensive opportunity to observe Helena and Rosa, and made routine calls monthly on Rosa after 1942. They were quite old, and not talkative. Rosa answered yes or no. Neither sister had any hallucinations, illusions or other evidence of mental derangment. They were sane and rational.

Edward J. McBride was with the New England, the Fidelity and the Union banks. He first knew the Reicher family in 1910. Helena, at times driving an electric coupe, stopped daily with Sol to make deposits. When the Fidelity Bank closed, Mr. McBride called on Helena and Rosa to secure

the trust estate for the Union Bank. After he explained the difference in the situation when the New England and Fidelity banks merged, they said they would have Mr. Crane attend to it. The amendment of December 22, 1933, resulted.

About 1936 or 1938 Whitney Ogden, then in charge of the trust, and Mr. McBride were called to the Reicher home. Helena, Rosa, Mrs. Bower and Mrs. Creek were present. The sisters wanted reinvestments to be in Government bonds. All participated in this discussion. Helena, Mrs. Bower and Mr. Crane called on R. B. Hewitt, head of the trust department, about a week later. Mr. Ogden was present. The merits of the various loans were discussed, and Helena stated Rosa and she had some apprehension about real estate securities and much preferred that reinvestments be confined to United States government bonds. Mr. Ogden and Mr. McBride met Helena, Mrs. Creek and Mr. Crane at the Commerce Trust Company's safety deposit department in 1940 and Helena handed them some government bonds to be placed in the trust fund. They also talked to Helena and Rosa at their 57th St. Terrace home, and briefly with Rosa at Helena's funeral.

Mr. Ogden "witnessed" the execution of the amendment of November 19, 1941, by Rosa. She was dressed for company. Mr. Crane handed her a copy and read a copy to her. Rosa followed the reading. Mr. Crane asked her if that was the way she wanted it. She answered: "Yes." She then signed it and Mr. Ogden "witnessed" her signature.

Mr. McBride and Mr. Ogden stated Helena and Rosa were rational and normal. Mr. Hewitt thought Helena mentally responsible and her position conservative and sound.

Theodore S. Cady, a public accountant and formerly an employee of the Fidelity and Union banks, first knew Helena and Rosa in 1938, and from 1940 on reconciled their bank accounts, going over the items with them, and made out their tax returns. He made twelve or more trips each year to the home. They were always interested in their income tax liability and he discussed the tax matters with them. Helena was quite talkative. She signed the checks up to her death, but both were always present. After that Rosa signed the checks. They knew what the checks were for. Rosa's signature was very legible in February, 1942; but she became increasingly physically inactive and her signature deteriorated with age, tremor and lack of sight and the bank objected to it. Mrs. Buck was authorized to sign checks, countersigned by witness, in September, 1944. Rosa's last check was January 5, 1946. The sisters were always serious. He never heard any giggling, or Rosa count, and never saw either with a glassy stare. Helena and Rosa were sane.

The sisters discussed in Mr. Cady's presence important changes to be made in the trust agreement. They mentioned Mr. Hart, Mr. Crane and Mercy Hospital, but not Mr. Cady, as beneficiaries. He identified the signatures of Helena and Rosa, as well as other signatures, on the several trust instruments.

Other witnesses narrated facts and testified that Helena and Rosa were sane. Wayne Gibson was a Detective Sergeant in the Homicide Bureau, and came in contact with persons having mental disorders. His family visited Mrs. Creek between 1939 and 1942 every week or so and the Reicher sisters visited them a few times. He talked to the sisters and stated "they were perfectly sane and perfectly rational." Cyrus Crane was the Reicher sisters' legal advisor. He died February 5, 1951, prior to the trial. Henry W. Fox, a lawyer in Mr. Crane's office, worked on the trust amendments of May 28, 1940, and November 19, 1941, witnessing, with Mr. Crane, the amendment of May 28, 1940. Mrs. Katherine B. Griggsby, Mr. Crane's secretary, typed the original trust agreement and all the amendments here involved. She testified that Helena and Rosa talked freely with Mr. Crane and her, and that Mrs. Bloch told her (denied by Mrs. Bloch) at Rosa's funeral she had not visited and did not know "a thing about" Helena or Rosa.

Mrs. Helen Conklin, a friend of Mrs. Creek, relieved Mrs. Creek before and after Helena's death. She lunched and talked with the sisters.

Mrs. Grace R. Buck was with Rosa from April 1, 1942, until Rosa's death. Rosa was old and Mrs. Buck arranged for Dr. Quistgard to call once a month as a matter of precaution. Rosa did not talk much and at first she had to "feel her way," watch the expression on her face, but after she gained Rosa's confidence they often talked, sometimes an hour in the evening. Rosa told her to use "our car" for errands. She wanted everything just so about the home. She had Robert act as her escort at Douglas' wedding. Rosa was in a hospital bed, with sides, prescribed by Dr. Quistgard, for her last three years and had to be fed. She corroborated Mr. Cady. Mrs. Buck stated it never entered her head that Rosa was anything but sane.

Mrs. Juanita Evans and Miss Myrtle Nash were registered nurses of many years experience and experienced with mentally ill persons. Mrs. Evans saw Rosa approximately 400 times between 1945 and 1950 as a visiting nurse. Miss Nash was called when Mrs. Creek died, March, 1942, and stayed until Mrs. Buck took over, and relieved Mrs. Buck from time to time. Each stated Rosa was rational and sane.

Helena and Rosa on July 15, 1940, executed reciprocal wills. Each testatrix stated she had theretofore disposed of practically all of her property through the medium of a trust, confirmed the disposition so made, and gave the residue of her property to her sister. Item 4 in each will was to the following effect: That testatrix, in disposing of her property through the trust and will, had "given full consideration to any possible claims of relatives," and had "taken counsel in regard thereto"; that her only living relatives, other than her sister, were "cousins, and after due consideration I am convinced none of them have any claim on my bounty, and, therefore, I am making no bequest to any of them." She stated "these facts" so it could never be claimed she had been unmindful of them.

Rosa, on December 1, 1941, executed a codicil to her will stating, so far as material: That Helena had died; that she, Rosa, had further amended the trust "and I reaffirm the disposition made of my property by that trust and its amendments." Then she gave her residuary estate "not placed in said trust," "to my friend Mrs. Helen Creek." She next reaffirmed what her will recited about having "no relative who has any claim on my bounty."

T. S. Cady, Harry M. Bergin and Clifton Ishmael witnessed each will and Mr. Cady and Mr. Bergin witnessed Rosa's codicil. Helena's will was filed but not probated. Rosa's will and codicil were admitted to probate upon proof of their due execution and publication and Rosa's soundness of mind and majority by Mr. Cady and Mr. Bergin. Mr. Ishmael, auditor for Socony Vacuum Oil Co., stated the sisters were rational and Rosa's conversations following Helena's death were intelligent.

▊ Being in equity, we review the record de novo. Our review is with deference to the findings of the trial chancellor on irreconcilable, directly conflicting, verbal testimony on fact issues, and his findings are usually sustained unless the overwhelming weight of the evidence appears to be against them. Scheer v. Gerleman, Mo., 221 S.W.2d 875, 880[3]; McCoy v. McCoy, 360 Mo. 199, 227 S.W.2d 698, 703, 704; Weakley v. Weakley, 355 Mo. 882, 198 S.W.2d 699, 702[1, 2]. The rule does not extend to evidence in the form of depositions, Proffit v. Houseworth, 360 Mo. 947, 231 S.W.2d 612, 616[2], or documents, Greenfield v. Petty, 346 Mo. 1186, 145 S.W. 2d 367, 370[6].

▊ The evidence on the issues of mental capacity and undue influence is in conflict. The mental incompetency or the undue influence must be operative at the time of the execution of a questioned instrument to invalidate it. McCoy v. McCoy, 360 Mo. 199, 227 S.W.2d 698, 703[3, 10, 14], citing cases. The dates important here are when the original trust agreement was executed, December 7, 1927; and when the amendments were executed, May

28, 1940, and November 19, 1941. Each amendment recognized, ratified and affirmed the prior instruments.

Dr. Major testified that by "unsound mind," he meant: "She was not of normal mind and did not realize just what she was doing and what was going on all the time." There is some question whether he personally recalled the exact condition of either sister. Claimants' witnesses Mr. and Mrs. Goldsmith, Mr. Katz, Mrs. Ohlhouse and Mrs. Look appeared by deposition. Mr. Katz and Mr. Coleman stated Helena was a competent bookkeeper. They contracted with these (according to them) insane sisters in April, 1929, for the incorporation of M. Reicher & Son, Inc., and accepted from them gifts of the corporate stock; Mr. Katz, at the instance of the sisters, was instrumental in the sale of M. Reicher & Son, Inc., stock in 1940, and accepted part of the profits from the purchasers. Mrs. Ohlhouse considered Helena an intelligent person. The conclusions of Mrs. Look and Mr. and Mrs. Goldsmith about Helena being too insane to work prior to Sol's death is refuted by witnesses, including claimants', possessing testimonial qualifications on that fact.

Dr. Sheldon, whose testimony covered from 1912 to 1939, and Dr. Quistgard, whose testimony covered from 1939 on, thought the sisters mentally competent. The mental specialists who examined Helena in 1928 and living at the time of trial established her then competency, and we think it a fair inference that the specialist who examined Rosa, had he not died, would likewise have established her competency. Mr. Gibson, who had experience with mentally affected persons, Mr. McBride, Mr. Ogden, Mr. Cady, Mr. Fox, Mrs. Griggsby, Mr. Ishmael, Mrs. Conklin, and the Creek boys had as much opportunity to observe Helena and Rosa as did claimants' witnesses. Mrs. Evans and Miss Nash, registered nurses, Mrs. Buck, Rosa's companion, and others stated Rosa was competent at a time subsequent to the last date material here. Rosa's will and codicil of December 1, 1941, were probated upon proof of her mental soundness. The trust instruments made provisions for their comfort and welfare for life and reserved full power to amend. On May 28, 1940, they eliminated the employees of M. Reicher & Son, Inc., as beneficiaries upon concluding the business had been badly managed. They gave the reasons for selecting the present beneficiaries. (See the amendment of November 19, 1941, supra.) Their wills recited the reasons for omitting their collateral relatives. See Shaw v. Butler, Mo., 78 S.W.2d 420, 431. Their request that reinvestments be made in Government bonds in the 1930s was considered financially sound. Apparently Mrs. Bloch was unable to convince her attorney that a submissible issue could be made on their mental incompetency in 1928 when he dismissed the two insanity proceedings. It is of some weight that the court has lost by death the benefit of the testimony of witnesses possessing knowledge of probative facts. Judge Landon, a former circuit judge and leading lawyer of the community, Mr. Strother and Mr. Crane, also leading lawyers, Mr. Estes, Dr. DeVilbiss, Dr. Gibson, Helena Reicher, Rosa Reicher, Mrs. Bower, Mrs. Creek. Nave-McCord Mercantile Co. v. Ranney, 8 Cir., 29 F.2d 383, 391[17]; 30 C.J.S., Equity, § 479a, page 874.

We think the evidence sufficient for findings that Helena and Rosa knew what their assets were, the natural objects of their bounty annd the nature of the transactions. Considering their family history and the lack of concern by claimants in their health and welfare, their trust instruments and respective wills are evidence of an exercise of judgment in the disposition of their property. Upon a motion to dismiss in an equity case, the trial court may weigh the evidence. Rigg v. Hart, Mo., 255 S.W.2d 778, 779[3, 4].

Undue influence may be established by circumstantial evidence. Norris v. Bristow, 358 Mo. 1177, 219 S.W.2d 367, 369[4], 11 A.L.R.2d 725. Mental and physical weakness and an opportunity to exercise undue influence by one in an exclusively confidential relationship are factors for consideration. Holland v. Anderson, Mo., 196 S.W.2d 175, 191[2];

Bohnsack v. Hanebrink, Mo., 240 S.W.2d 903, 907[4–6].

"The mere existence of an undue or improper influence, operating but not exercised by the person having it, is not sufficient to invalidate a deed or will. * * * There must be substantial proof of a pressure which overpowered the volition of the grantor or testator at the time the deed or will was made." White v. McGuffin, Mo., 246 S.W. 226, 231[1]. "The law does not ban as undue the natural influence of affection or attachment or the desire to gratify the wishes of one beloved and trusted. * * *" Horn v. Owens, Mo., 171 S.W. 2d 585, 592. See McCoy v. McCoy, 360 Mo. 199, 227 S.W.2d 698, 705[11, 14, 17, 19, 22]; Hamilton v. Steininger, 350 Mo. 698, 168 S.W.2d 59, 68; Seibert v. Hatcher, 205 Mo. 83, 105, 102 S.W. 962, 968; Powell v. Raleigh, Mo.App., 244 S.W.2d 387, 390[4].

We are not inclined to interfere if the trial chancellor gave the greater weight to plaintiffs' witnesses. Mrs. Bower was described as a high-minded Christian woman, competent, intelligent, faithful and kind to Helena and Rosa. Mrs. Creek was also faithful and gave them fine care. Rabbi Mayerberg and Mrs. Ohlhouse, claimants' witnesses, corroborated plaintiffs' witnesses on this. They depended upon Mrs. Bower and Mrs. Creek, one of whom was almost always with the sisters, to care for the home, the meals and their comfort. The Creek boys and other witnesses testified the sisters made the decisions. Dr. Sheldon, Mrs. Conklin and Mr. Cady stated they never saw Mrs. Bower or Mrs. Creek attempt to influence or dominate the sisters. Mr. Cady stated Mrs. Bower was interested in the matters he handled for the sisters. Dr. Shelton stated the sisters did not depend upon Mrs. Bower in financial matters. Mrs. Conklin heard Mrs. Creek discuss matters with them. Rosa would direct her to buy or not buy certain things, and Mrs. Creek did as directed. Mrs. Ohlhouse, claimants' witness, heard Mrs. Bower ask Helena about different things many times. Helena answered intelligently and Mrs. Bower followed Helena's instructions.

The record is to the effect that Mr. Hart and Mr. Crane were the business and financial advisors of the sisters when the original trust agreement was executed December 7, 1927. Mrs. Bower, as housekeeper and companion, did not occupy a fiduciary relation with respect to the matters here involved. Elzea v. Dunn, 297 Mo. 690, 249 S.W. 933, 936. There is no substantial showing that Mrs. Bower or Mrs. Creek or the plaintiffs had any part in the execution of said trust agreement. It provided for the distribution of the assets upon termination to named beneficiaries or to a deceased beneficiary's children or, if none, for dividing his share among the surviving beneficiaries. No claimant was a beneficiary and if said trust agreement stands claimants may not prevail. Our study of the exhibits referred to by claimants, when viewed in the light of the whole record, does not cause us to reach the ultimate conclusion stated in claimants' briefs.

■ Mrs. Bower was an integral part of the family life of the sisters. Mrs. Creek took her place. The sisters were fond of them. There was no close relationship, or affection or even friendship shown of record between the sisters and any of the collateral relatives. The record, although it may present fact issues over the later years, does not necessarily compel a finding for claimants on the issue of undue influence, and we sustain the findings of the trial chancellor.

The amendment of May 28, 1940, after providing that the trustors or the survivor could "modify, alter, terminate or revoke" the trust agreement in whole or in part, further provided in part: "That each of said Trustors, in consideration of the reciprocal action of the other Trustor, does hereby sell, assign, transfer and set over to the said Helena L. Reicher and Rosa Reicher, as tenants by the entirety with right of survivorship, all of the respective Trustors' right, title or interest (either legal or equitable) in or to the said trust estate and retained powers, privileges and incidents of ownership, if any, relating

thereto, including (without limiting the generality of the foregoing) the right to receive from the Trustee distributions of net income and principal during the lifetime of the trust estate or after termination of the trust agreement, whether by revocation or otherwise."

■ Claimants say that under this provision "upon Helena's death Rosa became the absolute owner of all of Helena's property in the custody of defendant Trustee, free from any purported limitation over after her death to" the beneficiaries named in the trust agreement or any amendment thereof. (Are claimants saying that Helena and Rosa were mentally competent to contract on May 28, 1940?) The trustors did not construe the quoted provision as terminating the trust as they continued to be governed by the trust provisions; and we construe the provision, in accordance with their intention as evidenced by its terms and their actions, to change the estate in common theretofore existing in the trust assets to an estate by the entirety in the trustors, and subject to the provisions of the trust agreement and its amendments unless terminated or revoked by the trustors or the surviving trustor, which never occurred.

Claimants contend they are entitled to those trust assets derived from the testamentary trust of the father, Morris Reicher, and the testamentary trust of the brother, Solomon Reicher, of the trustors.

The only asset listed in Morris Reicher's estate was an undivided one-half interest in M. Reicher & Son. He bequeathed an undivided one-third of his estate to his son, Sol; and undivided thirds to his son, Sol, as trustee for each of his daughters, Rosa and Helena. The trustee was to pay each beneficiary $50 monthly; but either daughter could terminate said trust with respect to the business of M. Reicher & Son by serving "a notice to that effect upon said trustee and three years after the date of the service of said notice" said trust was to terminate.

Solomon Reicher gave one-half of all his property, "including one-half of my one-

third interest in the business of M. Reicher & Son" to Helena; and the other half of his property, "including one-half of my one-third interest in the business of M. Reicher & Son" to Helena "in trust for the use and benefit of my sister Rosa Reicher, said Trustee to use such sum as may be necessary from the income of said property to properly support and maintain my sister, Rosa, as in the judgment of said Trustee is necessary. * * * Upon the death of my sister, Rosa, the trust shall cease and determine, and said property shall pass to my sister, Helena L. Reicher, absolutely."

Immediately following the father's death in 1913, Sol owned two-thirds of M. Reicher & Son, his original half plus the sixth bequeathed to him outright by his father. When Sol died in 1927 he owned only a one-third interest in M. Reicher & Son. He twice so stated in his will and the inventory of his estate so showed. Thus a change in the undivided interests of Sol, Helena and Rosa in M. Reicher & Son occurred between the deaths of Morris and Sol Reicher.

The agreement between Helena and Rosa Reicher and the employees for the incorporation of M. Reicher & Son provided for the transfer to the corporation, when formed, by Helena and Rosa of "all of the assets," "(but not the cash on hand) of the firm of M. Reicher & Son, of which they [Helena and Rosa] are now joint owners." The corporation was formed May 7, 1929, and when it was sold in 1940 Helena and Rosa received that portion of the proceeds represented by the stock owned by them. If, as claimants contend, this money became an asset of the trust estate, the trust agreement and amendments are further evidence of the trustors' joint ownership of M. Reicher & Son.

■ The stated facts are inconsistent with the continued existence of Morris Reicher's testamentary trust, and, after the lapse of the time and other circumstances involved, the presumption of right action permits of the inference that said trusts were terminated in accord with the

provisions of the father's will. This record points but one way; that is, that Morris Reicher's testamentary trusts were terminated. Hartwell v. Parks, 240 Mo. 537, 144 S.W. 793, 794 [1, 2, 3]; Williams v. Mitchell, 112 Mo. 300, 20 S.W. 647, 650; Emerson-Brantingham Implement Co. v. England, Mo.App., 186 S.W. 1181, 1184[6]; Lipic v. Wheeler, 362 Mo. 499, 242 S.W.2d 43, 47; 65 C.J. 320, nn. 51, 52; 54 Am.Jur. 470, n. 11; 4 Bogert, Trusts and Trustees, § 999, n. 98.

We are of opinion that Sol's will vested a fee in Helena in one-half of his estate and a vested remainder, subject to the trust estate for the life of Rosa, in the remaining half of his estate. Claimants' cases, Norman v. Horton, 344 Mo. 290, 126 S.W.2d 187, 192[12], 125 A.L.R. 531; Buxton v. Kroeger, 219 Mo. 224, 117 S.W. 1147, are distinguishable in that in each the contingencies related to the vesting of the title and not the coming-into enjoyment and possession of the estate. Adverbs of time or like words in grants creating remainders are construed, absent a contrary intention, to relate to the commencement of the remainderman's enjoyment and possession of and not the vesting of his title in the property. Tapley v. Dill, 358 Mo. 824, 217 S.W.2d 369, 373[8]; Gardner v. Vanlandingham, 334 Mo. 1054, 69 S.W.2d 947, 950[7, 10, 11]; Harlow v. Benning, 357 Mo. 266, 207 S.W.2d 471, 473. Gathering the intention of Sol from his will as a whole, he was disposing of all of his estate; and the phrase "upon the death of my sister, Rosa" related to when Helena came into the right of enjoyment and possession of the half held in trust for Rosa and not Helena's title, which vested upon testator's death. The result would be the same under the instant facts if Helena's interest be considered contingent upon her surviving Rosa as contended by claimants; for in that instance the reversion vested in Helena and Rosa upon Sol's death, and they could and did transfer said reversion to the Trustee. Lewis v. Lewis, 345 Mo. 816, 136 S.W.2d 66, 71; Keller v. Keller, 338 Mo. 731, 92 S.W.2d 157.

Claimants complain of the assessment of the costs against them. Trautz v. Lemp, 334 Mo. 1085, 72 S.W.2d 104, 109 [6], states the rule for the allowance of costs and attorney's fees "'does not apply where the bill is not filed merely for the purpose of obtaining a construction of the will and the direction of the court, but to enable complainant to obtain something as heir, *nor should the costs be paid out of the estate where it is determined that the complainant has no interest in any event.'*" Thatcher v. Lewis, 335 Mo. 1130, 76 S.W.2d 677, 684[13]; Lang v. Taussig, Mo.App., 194 S.W.2d 743, 748[7]; Scullin v. Mercantile-Commerce Bank & Trust Co., 361 Mo. 337, 234 S.W.2d 597, 604[13, 14]. In claimants cases the parties were successful in establishing their rights to trust assets. Bernheimer v. First Nat. Bank of Kansas City, 359 Mo. 1119, 225 S.W.2d 745, 755; Garrison v. Garrison, 354 Mo. 62, 188 S.W. 2d 644, 649; Section 527.100 RSMo 1949, V.A.M.S. The instant claimants unsuccessfully sought the destruction of the trust agreement.

The judgment is affirmed.

WESTHUES and BARRETT, CC., concur.

PER CURIAM.

The foregoing opinion by BOHLING, C., is adopted as the opinion of the court.

All concur.

On Motions for Rehearing or
Transfer to Court en Banc

PER CURIAM.

There has been filed herein on behalf of the claimants motions for rehearing or to transfer to Court en Banc.

As a part of the amendment of May 28, 1940, of the trust agreement the trustors stated that each sold, transferred and conveyed her respective rights, titles and interests in the trust assets to "Helena L. Reicher and Rosa Reicher, as tenants

by the entirety with right of survivorship." On original submission, Helena having predeceased Rosa, claimants argued that Rosa became the owner of Helena's property in the trust assets free from any effective limitation over to the trust beneficiaries, and that said estate devolved upon the death of Rosa to claimants as her heirs at law. Construing said transfer in accord with the intent of the trustors, we stated the trustors changed "the estate in common theretofore existing in the trust assets to an estate by the entirety in the Trustors," meaning thereby, as pointed out by claimants in the motions, an estate of "joint tenancy" rather than "an estate by the entirety," a tenancy reserved for a husband and wife relationship.

■ Claimants now argue that the trustors, tenants in common, could not by a direct conveyance create in the trust assets a joint tenancy in themselves, it being essential at the common law that there be unity of time, title, interest and possession for a joint tenancy, and that the creation of a joint tenancy required a transfer by the tenants in common to a stranger and a reconveyance by him to them as joint tenants. Breitenbach v. Schoen, 183 Wis. 589, 198 N.W. 622, 623 [2]; Deslauriers v. Senesac, 331 Ill. 437, 163 N.E. 327, 329[6–8], 62 A.L.R. 511; Strout v. Burgess, 144 Me. 263, 68 A.2d 241, 12 A.L.R.2d 939; Stuehm v. Mikulski, 139 Neb. 374, 297 N.W. 595, 598[3], 137 A.L.R. 327; Stone v. Culver, 286 Mich. 263, 282 N.W. 142[1, 2], 119 A.L.R. 512. Claimants say that Section 442.025 RSMo 1949, V.A.M.S., Laws Mo.1953, constitutes the first recognition of the right of an owner to act as grantor and grantee in a conveyance of real estate in Missouri. Claimants' cases involved personal as well as real property. The instant conveyance involved personal property held as part of a trust estate. We are referred to no Missouri case on the issue and have discovered none. There is a division among the authorities. Claimants' case of Breitenbach v. Schoen, supra, stands overruled in Re Staver's Es-

tate, 218 Wis. 114, 260 N.W. 655, 659, and In re Skillings's Estate, 218 Wis. 574, 260 N.W. 660, 662. In holding that the intention of the grantor or grantors overrides purely formalistic objections based on arbitrary distinctions and niceties of the feudal common law, some cases state the majority rule is contra to claimants' position. See, among others, Greenwood v. Commissioner of Internal Revenue, 9 Cir., 134 F.2d 915, 921[12]; and Switzer v. Pratt, 237 Iowa 788, 23 N.W.2d 837, 839, specifically disagreeing with the majority opinion in claimants' Nebraska case of Stuehm v. Mikulski, supra. Colson v. Baker, 42 Misc. 407, 87 N.Y.S. 238, 240, states there is no good reason for insisting upon a conveyance to a "dummy" and a reconveyance to create a joint tenancy.

The real issue is the incident of the "right of survivorship," and it appears that co-owners should have the right to agree among themselves that the survivor take the entire fee. Colson v. Baker, supra, citing Murphy v. Whitney, 140 N.Y. 541, 35 N.E. 930, 24 L.R.A. 123; Conlee v. Conlee, 222 Iowa 561, 269 N.W. 259, 262 [3]. The cases are reviewed in annotations appearing in 62 A.L.R. 514(III, IV); 137 A.L.R. 348; 166 A.L.R. 1026; 14 Am. Jur. 83, § 11, notes 5–7; 26 Am.Jur. 700, § 72, notes 13, 14; 48 C.J.S., Joint Tenancy, § 3c, page 916, notes 71, 72, 75, 76; 41 C.J.S., Husband and Wife, §§ 132, 134, 137b, page 606. Consult Restatement of Trusts, §§ 17, 100, 114; 1 Scott, Trusts, pp. 538, 539, 587, 588. In the instant case the provision under discussion was subject to the original trust agreement and its amendments, and claimants are not aided as the trust instruments were never terminated or revoked.

We have especially reviewed the issue of the assessment of the costs. Claimants stress Bernheimer v. First Nat. Bank of Kansas City, 359 Mo. 1119, 225 S.W.2d 745, 755; Lang v. Mississippi Valley Trust Co., 359 Mo. 688, 223 S.W.2d 404, 408; Kingston v. St. Louis Union Trust Co., 348 Mo. 448, 154 S.W.2d 39, 43; and Lang v. Taussig, Mo.App., 194 S.W.2d 743, 748. These cases involved the con-

struction and application of the provisions of the trust instruments, not their destruction. Plaintiffs as beneficiaries instituted the instant suit against the trustee for the distribution of the trust assets under the trust instruments and joined the other beneficiaries as defendants. The trustee interpleaded the claimants, who made no claim under the trust instruments but asserted claims based wholly upon the invalidity of the trust instruments. The authorities sustain our holding affirming the trial chancellor's ruling.

The other issues are sufficiently covered in the opinion.

The motions of the claimants for rehearing or to transfer are overruled.